781 A.2d 37

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND
CROSS–RESPONDENT, v. R.D., DEFENDANT–
RESPONDENT AND CROSS–APPELLANT.

Argued February 27, 2001—Decided July 16, 2001.

*Kristen A. McKearney*, Deputy Attorney General, argued the cause for appellant and cross-respondent (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney).

*Lon C. Taylor*, Assistant Deputy Public Defender, argued the cause for respondent and cross-appellant (*Peter A. Garcia*, Acting Public Defender, attorney).

The opinion of the Court was delivered by

LaVECCHIA, J.

In this appeal we consider whether defendant was deprived of a fair trial because the trial court failed to *voir dire* all jurors on being informed by one juror that he knew extraneous information about a witness. Immediately after hearing the witness testify, the juror notified the court that he realized he knew the witness and had knowledge of certain information concerning her. As a result, he stated he could not remain impartial. Before being excused, the juror informed the court that he had not discussed that information with any other juror. Neither counsel requested that any other member of the jury be questioned and the trial continued, ultimately resulting in defendant's conviction.

In an unpublished opinion, the Appellate Division held that the trial court committed plain error in not questioning the remaining jurors and reversed defendant's conviction. We granted certification, 166 *N.J.* 604, 767 *A.2d* 483 (2000), and now reverse, applying an abuse of discretion standard to the trial court's determination that a *voir dire* of the remaining jurors was not required.

I.

In July 1995, defendant, R.D., was charged with first-degree aggravated sexual assault, in violation of *N.J.S.A.* 2C:14–2a(2)(a) (Count One); second-degree sexual assault, in violation of *N.J.S.A.* 2C:14–2b (Count Two); second-degree endangering the welfare of a child, in violation of *N.J.S.A.* 2C:24–4a (Count Three); and third-degree terroristic threats, in violation of *N.J.S.A.* 2C:12–3 (Count

Four). The charges arose from allegations made by his seven-year-old granddaughter that he sexually molested her while she and her sister were staying with his family during her mother's hospitalization. The child's mother suffered from sickle cell anemia and required in-patient care from time to time.

On the first day of trial, a partial jury was selected. The following day, after the entire jury was empaneled, the judge made the following opening remarks:

> [D]on't discuss the case with your fellow jurors. Don't have conversation about the evidence or the trial with your fellow jurors during the trial.... In other words, you're going to be free to go have lunch in a little while, ... [w]e must put you on your honor that you will not discuss the case, and with regard to your fellow jurors, remember what I said when we were selecting you? ... Please don't discuss the case with your fellow jurors during the trial.

> If you were to go to lunch during the day and sit down with two other jurors and start talking about the case amongst the three of you, the other jurors aren't there. And by the same token, you wouldn't want other members of the jury to be talking about the case when you're not there. The time will come at the end of the case when I will want you to talk it over. But that's in the jury room at the end of the trial. Please don't talk to each other about the case before that.

Following that statement, the trial commenced with three witnesses testifying on behalf of the State, the last being the victim's mother. No breaks were taken during the mother's testimony, but the court did hold two sidebar discussions with counsel. At the conclusion of her testimony, the court informed the jury that they were finished for the day and reminded the jurors that they could not discuss the case with anyone. Before the jury was excused, the trial court stated that the juror who wished to discuss a scheduling matter concerning the next week could come forward after everyone had left. Following that remark, another juror, juror number two, stated to the court "I need to see you."

After the court addressed the scheduling matter, juror number two approached the bench at sidebar and informed the court that he belatedly realized that he knew the victim's mother. He stated that in his capacity as a nurse at Mountainside Hospital, he "took care of her" for about a week, and during that time he "overheard things about her relationship with her family." The following

exchange took place between the court and the juror, in the presence of counsel:

THE JUROR: In the beginning of the trial when you read all the names, I didn't recognize anybody. I know [the victim's mother] because I took care of her. I'm a nurse at the Mountainside Hospital and had her for a week.

THE COURT: [ ], the witness who just testified, is the mother of the alleged victim in this matter. You took care of her in Mountainside Hospital that night or on some other occasion?

THE WITNESS [sic]: No. I can't remember the dates. I took care of her about a week for the sickle cell.

THE COURT: All right. And was she your patient for a week?

THE JUROR: Yeah.

THE COURT: Other than treating her or whatever, what did your contact with her consist of, just so we know?

THE JUROR: I gave her pain medicines and—what troubles me is I overheard things about her relationship with her family.

THE COURT: During the course of that?

THE JUROR: And I formed an opinion, and I don't know, that's my problem.

THE COURT: I understand. You have some concern as to whether—now that you realize who she is, whether you could remain objective in this matter?

THE JUROR: My problem is that I formed an opinion way back then of some sort, that when you [sic] I see her up here, then I think back what happened outside the courtroom. Just things that I heard, and, you know, I mean it's hard for me—

THE COURT: Have you discussed this with any of the other jurors?

THE JUROR: No.

THE COURT: All right. Then of course I'm going to ask you not to do that. Let me talk to the lawyers briefly to see what they wish to do.

After consultation with both counsel, the trial court excused the juror with an additional admonition not to speak with the remaining jurors or with anyone else about what he knew concerning the case. Neither counsel asked the court to question the remaining jurors.

The following day, the remaining jurors were informed that juror number two had been excused because he realized that he knew one of the witnesses who had testified the day before. The trial continued, and defendant was acquitted of first-degree aggravated sexual assault but convicted of the lesser-included offense of second-degree sexual assault. He also was convicted on counts

two through four. The court sentenced defendant to concurrent eight-year terms on each of the second-degree sexual-assault convictions, a concurrent eight-year term on the endangering-the-welfare-of-a-child conviction, and a five-year concurrent term on the third-degree offense of terroristic threats.

## II.

■ The Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants "the right to ... trial by an impartial jury." *U.S. Const.* amends. VI, XIV; *N.J. Const.* art. I, ¶ 10; *see also Sheppard v. Maxwell*, 384 *U.S.* 333, 362–63, 86 *S.Ct.* 1507, 1522, 16 *L.Ed.*2d 600, 620 (1966) (stating that due process requires accused receive trial by impartial jury free from outside influence); *State v. Williams*, 93 *N.J.* 39, 60, 459 *A.*2d 641 (1983) (same). That constitutional privilege includes the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters. *State v. Bey*, 112 *N.J.* 45, 75, 548 *A.*2d 846 (1988) (*Bey I*); *State v. Biegenwald*, 106 *N.J.* 13, 32, 524 *A.*2d 130 (1987); *Williams*, *supra*, 93 *N.J.* at 60, 459 *A.*2d 641. "Securing and preserving an impartial jury goes to the very essence of a fair trial." *Bey I*, *supra*, 112 *N.J.* at 74, 548 *A.*2d 846 (quoting *Williams*, *supra*, 93 *N.J.* at 60, 459 *A.*2d 641). In *Bey I* we stated:

> Of particular significance here is that aspect of impartiality mandating "that the jury's verdict be based on evidence received in open court, not from outside sources." As expressed by Justice Holmes, "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." We recently noted the longstanding nature of this Court's commitment to the "[p]reservation of the jury's independence from extraneous—even judicial—influences." The Court has consistently required trial courts to protect both the jurors and their deliberations from illegitimate influences that threaten to taint the verdict.

> [*Bey I*, *supra*, 112 *N.J.* at 75, 548 *A.*2d 846 (internal citations omitted).]

■ In *Bey I* we held that if during the course of the trial it becomes apparent that a juror may have been exposed to extrane-

ous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality. *Id.* at 83–84, 548 *A.*2d 846; *see also Williams, supra,* 93 *N.J.* at 62–63, 459 *A.*2d 641 ("[T]he court has an independent duty to act swiftly and decisively to overcome the potential bias of a jury from outside sources."). Although *Bey I* involved mid-trial publicity, the Court's direction to trial courts is apt for other mid-trial instances of juror exposure to extraneous information. The trial court must use appropriate discretion to determine whether the individual juror, or jurors, "are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court." *Bey I, supra,* 112 *N.J.* at 87, 548 *A.*2d 846.

The court is obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint; if so, the inquiry must expand to determine whether any other jurors have been tainted thereby. Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 1:16–1 (2000). The trial court must then determine whether the trial may proceed after excusing the tainted juror or jurors, or whether a mistrial is necessary. *Ibid; see also State v. Bisaccia,* 319 *N.J.Super.* 1, 13, 724 *A.*2d 836 (App.Div.1999) (stating that if actual juror taint is possible, court must *voir dire* affected juror and, in appropriate circumstances, remaining jurors). The decision to grant a new trial based on jury taint resides in the discretion of the trial court, but as we stated in *Panko v. Flintkote Co.,* 7 *N.J.* 55, 61, 80 *A.*2d 302 (1951), "[i]f the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so." *Id.* at 61, 80 *A.*2d 302; *see also State v. Hightower,* 146 *N.J.* 239, 266–67, 680 *A.*2d 649 (1996) (stating "[a]ny juror misconduct or improper intrusion into the deliberations of a jury that 'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge'

is a ground for a mistrial" (citation omitted)). The right to an impartial jury is of exceptional importance, and "that aspect of impartiality mandating 'that the jury's verdict be based on evidence received in open court, not from outside sources'" is particularly critical to fulfilling the essence of that right. *Bey I, supra,* 112 *N.J.* at 75, 548 *A.*2d 846 (quoting *Sheppard, supra,* 384 *U.S.* at 351, 86 *S.Ct.* at 1516, 16 *L.Ed.*2d at 613).

A new trial, however, is not necessary in every instance where it appears an individual juror has been exposed to outside influence. *See Smith v. Phillips,* 455 *U.S.* 209, 217, 102 *S.Ct.* 940, 946, 71 *L.Ed.*2d 78, 86 (1982) ("[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.... [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."). Ultimately, the trial court is in the best position to determine whether the jury has been tainted. That determination requires the trial court to consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings. The inquiry about whether extraneous information had the *capacity* to influence the result of the jury requires an examination of whether there was at least an opportunity for the extraneous information to reach the remaining jurors when that extraneous information is knowledge unique to one juror who is excused mid-trial. *E.g., State v. Wormley,* 305 *N.J.Super.* 57, 70, 701 *A.*2d 944 (App.Div.1997) (finding that even though excused juror stated she did not discuss extraneous matter with anyone, there was a "strong likelihood that, even indirectly or unintentionally, she may well have," given that there was at least one break during which jurors commingled informally), *certif. denied,* 154 *N.J.* 607, 713 *A.*2d 498 (1998).

The abuse of discretion standard of review should pertain when reviewing such determinations of a trial court. Application of that standard respects the trial court's unique perspective. We

traditionally have accorded trial courts deference in exercising control over matters pertaining to the jury. *See State v. Simon,* 161 *N.J.* 416, 466, 737 *A.*2d 1 (1999) (holding court has discretion over whether to exclude juror from jury pool based on responses to questions on *voir dire*); *State v. Harvey,* 151 *N.J.* 117, 214, 699 *A.*2d 596 (1997) (noting that jury sequestration is decision generally left to discretion of trial court), *cert. denied,* 528 *U.S.* 1085, 120 *S.Ct.* 811, 145 *L.Ed.*2d 683 (2000); *State v. Czachor,* 82 *N.J.* 392, 407, 413 *A.*2d 593 (1980) (stating that court has discretion in ordering jury to continue deliberating after it has announced deadlock). Many state and federal courts also apply an abuse of discretion standard of review to a trial court's decision not to *voir dire* remaining members of the jury following the excusal of a single juror. *E.g., United States v. Davis,* 177 *F.*3d 552, 557 (6th Cir.1999) (finding trial court abused its discretion in failing to question other jurors where excused juror admitted expressing his fears to other jurors); *United States v. Cantu,* 167 *F.*3d 198, 202 (5th Cir.), *cert. denied,* 528 *U.S.* 818, 120 *S.Ct.* 58, 145 *L.Ed.*2d 50 (1999) (applying abuse of discretion standard of review to trial court's decision not to *voir dire* remaining jurors); *United States v. Rosales,* 680 *F.*2d 1304, 1306 (10th Cir.1981) (same); *People v. Aleman,* 313 *Ill.App.*3d 51, 246 *Ill.Dec.* 20, 729 *N.E.*2d 20, 31, *appeal denied,* 191 *Ill.*2d 536, 250 *Ill.Dec.* 460, 738 *N.E.*2d 929 (2000), *cert. denied,* 531 *U.S.* 1152, 121 *S.Ct.* 1097, 148 *L.Ed.*2d 969 (2001) (same); *Commonwealth v. Francis,* 432 *Mass.* 353, 734 *N.E.*2d 315, 330 (2000) (same).

 An appropriate *voir dire* of a juror allegedly in possession of extraneous information mid-trial should inquire into the specific nature of the extraneous information, and whether the juror intentionally or inadvertently has imparted any of that information to other jurors. Depending on the juror's answers to searching questions by the court, the court must then determine whether it is necessary to *voir dire* individually other jurors to ensure the impartiality of the jury. That determination should be explained on the record to facilitate appellate review under the

abuse of discretion standard. But the decision to *voir dire* individually the other members of the jury best remains a matter for the sound discretion of the trial court. No *per se* rule should obtain. The court may learn through its questioning of the excused juror that circumstances made it impossible for that juror to impart impermissible information to the other jurors even unintentionally. Although the court should not simply accept the juror's word that no extraneous information was imparted to the others, the court's own thorough inquiry of the juror should answer the question whether additional *voir dire* is necessary to assure that impermissible tainting of the other jurors did not occur. In some instances, the court may find that it would be more harmful to *voir dire* the remaining jurors because, in asking questions, inappropriate information could be imparted. *See United States v. Bertoli,* 40 *F.*3d 1384, 1395 (3d Cir.1994) (stating that court must balance potential benefits of further investigation against possible harm of calling attention to matters about which jurors may have been unaware); *United States v. Butler,* 822 *F.*2d 1191, 1196 (D.C.Cir.1987) (stating trial judge has broad discretion to fix exact procedures by balancing need to make sufficient inquiry against concern that inquiry not create prejudicial effects); *People v. Jenkins,* 22 *Cal.*4th 900, 95 *Cal.Rptr.*2d 377, 997 *P.*2d 1044, 1103 (2000) (same), *cert. denied,* 531 *U.S.* 1155, 121 *S.Ct.* 1104, 148 *L.Ed.*2d 975 (2001); *State v. Mukhtaar,* 253 *Conn.* 280, 750 *A.*2d 1059, 1072 (2000) (same). Our dissenting colleague's proposition that the court must be required to *voir dire* the remaining jurors in every instance of mid-trial juror taint skirts that important concern. We decline to adopt a *per se* requirement that so restricts the trial court's discretion in handling mid-trial juror taint.

## III.

Defendant argues that he should be afforded a new trial because the trial court did not conduct *sua sponte* an individual *voir dire* of the remaining jurors to ascertain whether they had

been tainted by any information the dismissed juror may have imparted to them. Our review of the record leads us to disagree. The trial court did not abuse its discretion in not questioning the remaining jurors.

Here, the excused juror had no opportunity to communicate impermissible information to his fellow jurors. Immediately after the victim's mother testified as the third and last witness on the first day of evidentiary proceedings in this matter, the juror approached the court with his concern for his own impartiality based on his out-of-court knowledge of that witness. The juror stated that he did not recognize her name from the witness list and did not realize that he knew the witness until he saw her when she testified. As noted, she was the last witness of the day. No breaks were taken during her testimony so there was no opportunity for the jurors to commingle outside the presence of the trial court. Thus, not only had the excused juror denied communicating his knowledge to other jurors, but there also was no chance for the excused juror to communicate his extraneous information about the witness to the other jurors. We note that the court repeatedly instructed the jurors not to discuss the case with each other until they were so directed. *See State v. Manley*, 54 *N.J.* 259, 270, 255 *A.*2d 193 (1969) (stating that juries have responsibility to faithfully follow judge's instructions whenever given, and presumption is that they discharge that duty). The court had sufficient opportunity to observe the juror during his two exchanges with him and form an opinion concerning the juror's credibility and reliability, particularly in light of the corroborating circumstances. In the unusual circumstances that arose here, we see no reason to reject the trial court's judgment that additional questioning of other jurors was not necessary to ensure a fair trial for defendant. We decline to impose a *per se* requirement that such additional questioning be conducted in all instances.

 Although we conclude that in applying an abuse of discretion standard here, the court did not err in failing to *voir dire* the remaining jurors *sua sponte* after excusing juror number two, we

would have preferred further inquiry of the excused juror. The juror informed the court that as the victim's mother's nurse he "overheard things about her relationship with her family." The court did not delve deeper into the matter. Perhaps further questioning of the juror would have revealed more precisely when the juror recognized the witness and whether he recalled engaging in any nonverbal communication that may have exposed his extraneous knowledge concerning the witness to other jurors. But, the trial court's failure to do so did not constitute plain error.

It is the duty of the court to ask probing questions to protect the impartiality of the jury. The response of a juror is not necessarily sufficient. Here, we are convinced that there was no meaningful opportunity for the other members of the jury to be tainted because of the combination of the excused juror's assertions that he did not inform any other juror that he had extraneous information relating to the victim's mother, the trial court's apparent assessment of his credibility combined with his promptness in coming forward at the conclusion of the mother's testimony, and the lack of opportunity to communicate with the other jurors. Accordingly, we conclude that the trial court did not abuse its discretion and that the jury verdict should not have been overturned.

## IV.

The judgment of the Appellate Division is reversed. The matter is remanded to that court for it to consider the remaining issues raised by defendant on his direct appeal.

STEIN, J., dissenting.

The charges against defendant arose from allegations by his seven-year-old granddaughter that he had sexually molested her while the victim's mother, R.R., was hospitalized for sickle cell anemia. The Court's opinion acknowledges that on the second day of trial, after a complete jury was empaneled, three witnesses testified for the State including R.R., who was the last to testify.

The majority explains that at the conclusion of R.R.'s testimony, juror number two approached the trial court and informed the court that he knew R.R. because he worked as a nurse at Mountainside Hospital and took care of R.R. for a week for her sickle cell anemia. At that time, the juror told the court that he "overheard things about her relationship with her family," and "formed an opinion" that made it hard for him to be a juror. The trial court then asked the juror if he had discussed this information with any of the other jurors and he answered that he had not. Despite the juror's admission that he knew one of the State's primary witnesses, the trial court did not question that juror further nor did the court question the other jurors about whether juror number two imparted any impermissible information to them. Instead, the trial court merely excused the tainted juror and on the following day told the remaining jurors that juror number two was excused because he recognized one of the witnesses.

Essentially, on the basis of those facts, the Appellate Division reversed defendant's conviction because it concluded that the trial court's failure to poll the jury about the possibility of taint constituted reversible error. The Court now reinstates defendant's conviction, concluding that the trial court acted appropriately and did not commit reversible error in failing to question juror number two in more detail and to conduct a *voir dire* of the remaining jurors. In my view, the Court errs in its disposition because it understates the potential for juror taint revealed by the entire record and, in the process, diminishes the previously heightened responsibility of trial courts in criminal cases to act aggressively to assure the impartiality of the trial jury.

I

A complete review of the record indicates that juror number two, despite his statement to the contrary, may have been aware that he knew R.R. prior to her taking the witness stand. During opening statements, the prosecutor made a number of references

to the fact that R.R. was the mother of the victim and that she was being treated for sickle cell anemia at Mountainside Hospital during the alleged sexual assault of her daughter. For example, the prosecutor described the facts that caused R.R. to leave her home alone with defendant:

> The children were brought over to the [D's] house from time to time. The [D's] baby sat for the two girls. Everything went smoothly, the relationship was a good one, until October, of 1994.
>
> Because on October 4th, 1994, [R.R.] had to be hospitalized. [R.R.] is now her new married name. She married a man named [J.R.]. *[R.R.] suffers from sickle cell anemia.*
>
> For those of you not familiar with it, it's a terrible affliction that involves a great deal of pain, a constant pain, and in certain instances, *it entails extreme pain, unbearable pain which requires her to be hospitalized, as she was in October, of 1994. She was in the hospital for about a week.*
>
> [(Emphasis added).]

Thereafter, the prosecutor explained that when R.R. learned of the alleged sexual assault of her daughter,

> [R.R.] immediately took her daughter to the hospital. And I believe first she took her to *Mountainside Hospital,* because that's where she was normally treated. But as it turns out, the Rape Crisis Center in Essex County is located at the United Hospital. [R.R.] frantically took her to United Hospital where her daughter was finally examined. . . .
>
> [(Emphasis added).]

Juror number two echoed the prosecutor's comments when he later informed the trial court that he recognized R.R. He stated: "I know [R.R.] because I took care of her. I'm a nurse at the Mountainside Hospital and had her for a week." He added that "I took care of her about a week for the sickle cell." The juror had a distinct memory of caring for R.R.: "I gave her pain medicines and—what troubles me is I overheard things about her relationship with her family." He went on to explain that "[m]y problem is that I formed an opinion way back then of some sort, that when [ ] I see her up here, then I think back what happened outside the courtroom. Just things that I heard, and, you know, I mean it's hard for me."

A clear possibility exists that juror number two may have realized that he knew R.R. based on the prosecutor's opening

remarks that she had sickle cell anemia and had been hospitalized for a week at Mountainside Hospital. In addition, as one of the State's primary witnesses and the mother of the victim, R.R. probably was present in the courtroom during the first day of jury selection and opening statements. Juror number two could have recognized R.R. as he listened to the prosecutor's comments describing her hospitalization at Mountainside Hospital and re-called events that made him form an opinion about the matter.

Accordingly, I disagree with the majority's conclusion that "the excused juror had no opportunity to communicate impermissible information to his fellow jurors." Following the prosecutor's opening remarks during which he spoke of R.R.'s hospitalization at Mountainside Hospital, the court took a forty-five minute lunch recess, an occasion when juror number two could have spoken to the other jurors. After the jury returned from lunch and defense counsel finished delivering his opening remarks, the court excused the jurors again because the court needed to confer with counsel concerning the testimony of the State's first witness. That recess gave juror number two a second opportunity to communicate with the other jurors.

Because there clearly were opportunities for that juror to convey impermissible information to other jurors, I agree with the Appellate Division that the trial court's failure to *voir dire* the remaining jurors after excusing juror number two constituted plain error. Although the juror claimed that he did not recognize R.R. until he saw her testify, there was a realistic possibility that the juror could have recognized R.R. prior to her appearance on the witness stand, or could have realized that he knew her, and conveyed information about the case to his fellow jurors.

II

In *State v. Bey*, 112 *N.J.* 45, 548 *A.*2d 846 (1988), this Court emphasized the importance of a fair and impartial jury and reversed the defendant's conviction based in part on our concern

that mid-trial publicity presented a "realistic possibility that information with the capacity to prejudice the defendant may have reached one or more members of the jury." *Id.* at 91, 548 *A.*2d 846. In reaching that determination, we echoed this Court's prior observation that the "securing and preservation of an impartial jury goes to the very essence of a fair trial" and that "triers of fact must be as nearly impartial as the lot of humanity will admit." *Id.* at 75, 548 *A.*2d 846 (quoting *State v. Williams,* 93 *N.J.* 39, 59–62, 459 *A.*2d 641 (1983)) (internal quotation marks omitted). We noted further that "[t]he Court has consistently required trial courts to protect both jurors and their deliberations from illegitimate influences that threaten to taint the verdict." *Ibid.*

To protect the jury from those outside influences, the Court in *Bey* underscored the significance of questioning jurors when a significant threat to their impartiality was revealed. We said that the "procedure is prophylactic in nature, designed to uncover potential prejudice to extremely significant constitutional rights that might otherwise go wholly undetected, and to do so at a time when corrective measures remain possible, that is, before ordering a new trial has become the only option." *Id.* at 89, 548 *A.*2d 846.

The Appellate Division similarly has recognized that when a juror is tainted, a trial court must take prophylactic measures to prevent further taint of the jury pool. In *State v. Wormley,* 305 *N.J.Super.* 57, 701 *A.*2d 944 (App.Div.1997), *certif. denied,* 154 *N.J.* 607, 713 *A.*2d 498 (1998), the defendants were convicted on robbery and weapons offenses for robbing an individual at gunpoint and escaping in a getaway car. On the first day of trial, the State presented the testimony of the individual who chased the defendants' getaway car. The court later recessed for lunch and juror number seven asked to speak to the judge. The juror said that when she heard the witness's testimony, she realized that the robbery victim was her former co-worker and recalled that she "heard things" about the incident. The trial court asked the juror if she revealed her knowledge to any other jurors and she

responded that she had not told anyone. The court then excused her, but made no further inquiry of the other jurors.

The Appellate Division held that the court's failure to *voir dire* the remaining jurors concerning whether juror number seven had imparted to them any impermissible information was plain error. The court noted that the juror's familiarity with the victim and the incident itself "was not only disqualifying, but potentially impermissibly tainting, whatever her views may have been." *Id.* at 69, 701 *A*.2d 944. Although the juror claimed that she did not convey her knowledge to the other jurors, the court held that there was a strong likelihood that she may have done so because there had been at least one occasion during the trial when that juror commingled with other jurors.

### III

In my view, the majority errs in declining to acknowledge that once a tainted juror is identified mid-trial, the trial court is required to *voir dire* the remaining jurors even if the likelihood of contact with the tainted juror is minimal. Consistent with our strong common-law tradition of securing a fair and impartial jury, trial courts should not merely rely on a juror's word that he or she did not share information with other jurors. Trial courts must aggressively weed out the possibility of juror taint, and if courts fail to take appropriate action juror taint should be presumed and a mistrial declared. As the comment to *Rule* 1:16 states, on being notified of potential juror taint during the course of a trial a court is

> *obliged to interrogate the juror in the presence of counsel and to determine if there is a taint and if so, if any other jurors have been infected thereby.* If the court does find a taint, it must then determine, assuming a sufficient number of jurors remain, whether the trial may proceed upon excluding the tainted juror or jurors or whether a mistrial must be declared. *If the trial court fails to so proceed and the circumstance is indeed one which is apparently tainting, the taint must be presumed* and a new trial ordered.
>
> [Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 1:16–1 (2001) (emphasis added).]

In reversing the Appellate Division's disposition, the Court is unwisely diminishing the responsibility of trial courts to verify that a tainted juror has not influenced other jurors and to assure that defendants are tried by fair and impartial juries. Here, the trial court undoubtedly made two errors. As the majority acknowledges, the court failed to adequately interrogate juror number two to determine the extent of his taint. After concluding that the juror was tainted and excusing him, the court failed to question the remaining jurors concerning their exposure to potentially damaging information adverse to defendant. Polling the jurors "operates to safeguard the rights of the accused and vindicate societal interests in the fair and efficient administration of the criminal justice system." *Bey, supra,* 112 *N.J.* at 89–90, 548 *A.*2d 846.

I would hold that when a trial court is informed mid-trial of potential juror taint, the court is obligated to question that juror in detail to determine the extent of his or her taint. If, after a complete interrogation of that juror, the court concludes that the juror is sufficiently tainted to warrant dismissal, then the court is obligated to *voir dire* the remaining jurors to determine whether the tainted juror imparted impermissible information to them. As we noted in *Bey,* mid-trial *voir dire* imposes a minimal burden on the court system, and the benefit secured by taking such precautionary measures is to assure the jury's impartiality. See *Bey, supra,* 112 *N.J.* at 90, 548 *A.*2d 846.

I would affirm the Appellate Division's disposition and remand this matter for a new trial.

*For reversal and remandment*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—6.

*For affirmance*—Justice STEIN—1.