72 A.3d 247

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JOSE L. NEGRETE, A/K/A BOOM BAP, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted March 6, 2013—Decided August 13, 2013.

Before Judges GRALL, KOBLITZ and ACCURSO.

*Joseph E. Krakora,* Public Defender, attorney for appellant (*Alison Perrone,* Designated Counsel, on the brief).

*Joseph L. Bocchini, Jr.,* Mercer County Prosecutor, attorney for respondent (*John P. Boyle, Jr.,* Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

GRALL, J.A.D.

The first jury to try defendant Jose Negrete on charges related to the killing of Jeri Lynn Dotson and the attempted killing of Alex Ruiz was unable to reach a verdict. A second jury found defendant guilty of conspiracy to commit murder, *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:11–3; attempted murder, *N.J.S.A.* 2C:5–1 and *N.J.S.A.* 2C:11–3; and murder, *N.J.S.A.* 2C:11–3a(2). After merging defendant's conspiracy conviction, the judge sentenced him to a life term of imprisonment for murder and a consecutive twenty-year term for attempted murder. Both sentences are subject to terms of parole ineligibility and supervision required by the No Early Release Act, *N.J.S.A.* 2C:43–7.2. The judge also imposed the appropriate monetary penalties.

Defendant appeals urging reversal of his convictions on four grounds and, in the alternative, contends that his sentences are excessive and should be concurrent. The most significant question is whether Juror Number 8's (Juror 8) participation in

deliberations requires reversal of his convictions. Because Juror 8 disclosed information about his relationship with a witness, in violation of the judge's direction, and disclosed information he had heard about the crime scene prior to trial that was not introduced in evidence, in violation of the jury instructions, we conclude that it does.

I

Defendant and eight codefendants were indicted together, but defendant was tried alone.[1] The State's theory of the case was that as leader of the Trenton chapter of the Almighty Latin King and Queen Nation (Kings), defendant ordered the killing of Dotson and Ruiz because of their connections with the Neta Association (Netas), which was a rival of the Kings, in August 2004. That is when Dotson was killed and Ruiz survived strangulation, a beating and being left for dead in a dumpster. Both Dotson and Ruiz had connections with the Kings and the Netas.

Although the groups were not always hostile, tensions developed in July 2004, shortly after defendant assumed leadership of the Kings. As the King's leader, defendant embarked on an effort to improve the Kings by adding "more structure" and recruiting additional members, including Netas.

When defendant assumed leadership, Dotson, a Latin Queen, was dating the Neta's leader, Fernando Rivera–Maestra (Maestra).[2] Dotson had formerly dated Kings member Dimas Peralta, and he was the father of her children, who were both under four years old in the summer of 2004. Peralta served as defendant's second in command for a short time after defendant became

---

[1] Four of his codefendants pled guilty and testified for the State—Roberto Rodriguez, Rhadames Acosta, Esmeraldo Rodriguez and Joey Martinez. As to the other four—Angel J. Hernandez, Jorge Gomez, Maurice M. Young and Josue Maldonado—on this record, it is not clear how their charges were disposed.

[2] Maestra was known as Fernando Rivera and Fernando Maestra; at trial some witnesses referred to him as Rivera and others as Maestra.

leader of the Kings, and after Peralta left that position, the Kings used Peralta's house for meetings, including trials of members charged with violating the Kings' rules.

Ruiz and his brother were Netas, but Ruiz had a friend, Esmeraldo Rodriguez, who was a King. In addition, Ruiz was living in the basement of the house where Dotson and her children lived in July and August 2004. At Esmeraldo's urging, Ruiz decided to join the Kings. Ruiz informed Maestra of his decision on July 25, 2004.

Maestra and several Netas, including Ruiz's brother, were displeased by Ruiz joining the Kings. Consequently, they went to Dotson's house, where Ruiz and his brother fought before the other Netas attacked and beat Ruiz.

Ruiz understood the beating to be a formal dismissal from the Netas, but Maestra did not. Maestra contacted defendant and notified him that Ruiz could not join the Kings until he was given an official beating.

Thereafter, the Kings and Netas fought when they encountered one another and Maestra ended his relationship with Dotson. By Maestra's account, he broke up with Dotson out of concern for her safety.

Nevertheless, Dotson helped defendant try to broker peace. She called Maestra to arrange a meeting between him and defendant. Although Maestra could hear defendant telling Dotson what to say, he agreed to meet. Both men appeared for the meeting, but it did not occur. Defendant had more people with him than agreed, and the police appeared.

Both Maestra and defendant suspected that someone had informed the police. Defendant took action. He called a meeting of the Kings and announced that Dotson and Ruiz had to be "gonners," which at least one of the attendees took to mean that they had to be killed.

As the "war" continued and escalated to the point that Netas and Kings were shooting at each other, defendant and Maestra

met twice to discuss a peace involving "taking care of" Ruiz and Dotson. After the second meeting, which was held on August 30, 2004, Maestra agreed to "take care of" Ruiz and defendant agreed to turn Ruiz over. There was conflicting testimony on which of the leaders was to take care of Dotson. Because Ruiz's brother was a member of the Netas, Maestra had no intention of doing anything more than beating Ruiz, but Maestra did not tell defendant that was his plan.

Later in the day on August 30, defendant and other Kings met Ruiz in a park, and in accordance with defendant's prior instructions, the Kings left Ruiz alone when the Netas arrived. The Netas removed Ruiz and beat him until Ruiz's brother intervened. Afterward, they took Ruiz to Dotson's home.

In the meantime, defendant convened a meeting at Peralta's home during which Dotson was tried by the Kings for treason on an allegation she gave information to Maestra and the Netas. Peralta was at the meeting and testified for the State at defendant's trial. The testimony on the outcome of Dotson's "trial" by the Kings was conflicting.

Dotson found Ruiz in her house beaten on August 30, and they called Ruiz's recruiter, Esmeraldo, with a complaint about the Kings betraying him. Defendant was angered by hearing that Ruiz had survived, and he called Maestra and accused him of breaching their agreement. According to Maestra, defendant said he would have his "soldiers handle it."

By Esmeraldo's account, defendant ordered him and four other Kings to remove Ruiz from Dotson's home and "take [him] out." They abducted Ruiz and strangled him in the car en route to Duck Island. On reaching their destination, they stomped on Ruiz's face to make sure he was dead, threw him in a dumpster and called defendant to say they had carried out his order.

The men met with defendant later and told him Dotson was home when they removed Ruiz. According to Esmeraldo, defendant "said that's not good, can't have nobody snitching on us."

Defendant ordered five Kings to get rid of Dotson because she was a "security threat."

At 7:30 a.m. on August 31, police responded to a call from a neighbor reporting that Dotson's daughter had come to her door and said her mother had been shot. The police found Dotson lying on her back in a pool of blood on the basement floor. There were objects, including a piece of candy and a cigarette lighter on her body. One of the investigators, Officer DiNatale, noted that a cabinet over her body was open and that the candy had apparently fallen from it onto Dotson's body. Dotson died as a consequence of a single gunshot to the back of her head.

In summation, defense counsel argued:

> Now who killed Jeri Lynn Dotson. I still don't know.
>
> Was it Resse at Esmo's suggestion? I don't know.
>
> Was is some Netas at [Maestro's] suggestion? I don't know.
>
> Was it somebody jealous about her love life, I don't know. I heard Officer DiNatale say yes, and the candy and lighter fell on her. And at the risk of suffering your revulsion, I'll just encourage you to look at the picture of [Dotson's] body. You tell me how the lighter and the candy just fell to land perfectly on her stomach unless somebody placed it there. It clearly didn't happen when she fell down dead. I mean, that justifies [sic] all logic. Somebody either placed it there when she was shot or when they went back, depending upon what you believe.

The prosecutor did not address the candy or lighter in his closing.

## II

Defendant's claim of juror misconduct is based on disclosures Juror 8 made in deliberations. Specifically, Juror 8 told the other jurors that he went to school with Peralta and knew him from the neighborhood; that his girlfriend Mimi was friendly with Peralta's sisters who took care of Dotson's children; and that Peralta's sister told Mimi that one of Dotson's daughters said she put the candy on her mother's stomach. The other jurors were concerned by the fact that Juror 8 was on the jury despite knowing Dimas Peralta, the father of Dotson's children, and by the fact that Juror 8 had disclosed facts not in evidence. Consequently, they sent a note to the judge asking for guidance.

The judge and the attorneys already knew that Juror 8 knew Peralta. During jury selection, Juror 8 came to sidebar and advised the judge and lawyers of his acquaintance with Peralta. At that time, Juror 8 said they were in the same school years before, but he also said he had not seen Peralta for a long time and did not consider Peralta a friend. Juror 8 was confident that he could decide the case without being influenced by their relationship. The judge told Juror 8 not to disclose his relationship with Peralta to the other jurors, and Juror 8 said he would not. Apparently convinced that Juror 8 could serve, neither the judge nor the attorneys took any action to remove him.[3]

Deliberations commenced after the lunch break on May 13, 2009. The record does not indicate whether the jury sent the note about Juror 8 before leaving the court house on May 13 or after resuming deliberations on May 14. The only transcript from May 14 we have, begins with the judge questioning the foreperson about the note they sent. It states, "[Juror 8] has expressed knowing and going to school with Dimas [Peralta], the father of Jeri Lynn Dotson['s children]. And has expressed information about [Dotson] that was not brought up in the trial. Please advise us as to how to proceed."

---

[3] Between jury selection and deliberations, the judge spoke to Juror 8 three times, none of them involving matters suggesting misconduct on his part.

First, after the jury was sworn and prior to opening statements, Juror 8 asked about the duration of the trial and the hours of attendance it would require, noting that his supervisor was not happy about the expected length of the trial. He acknowledged, however, that service was not a hardship for him and continued to serve.

Second, during the trial, the judge questioned all of the jurors about an incident involving a person observing the trial saying "God bless" as the jurors passed him on the steps while leaving the court house. All of the jurors acknowledged they would not be influenced by the spectator's comment.

Third, upon receiving a report from Juror 8's sister that she had been approached by a man who inquired about her brother being on the jury and asking what he was thinking, the judge questioned Juror 8. He advised that the incident would not influence him and that he had not told any other juror about it.

While the jurors' had differing recollections of what Juror 8 said and not all of them heard everything, Juror 8's recollection was precise, and he did not omit anything the others attributed to him. The judge started her colloquy with Juror 8 by reading the note and reminding him that he had said he would keep that information to himself. Acknowledging his vow, Juror 8 said he told the others "about how the candy got in [sic] her stomach," which he said was "what we were discussing." Asked about how and when he acquired information about the candy, Juror 8 said, "I believe I told you that my kids' mother[—Mimi—]was friends with Dimas' sisters. And when the murder happened [Mimi] came to me and told me, you know, this happened to Dimas you know." As Juror 8 recalled what Mimi told him, it was that "[Peralta's sister] had talked to the little girl or whatever, and the little girl told her that she had placed the candy on her."

Juror 8 admitted, "I told [the other jurors] that Mimi knew the, the kids' aunt[s], and that they had told her that the little girl placed the candy, and then everybody said, well, that wasn't in the trial. We should ask the judge the question. Can we proceed[?]" Juror 8 said he told the other jurors about going to school with Dimas because they asked how he knew "the aunt and stuff."

After speaking with Juror 8, the judge interviewed each juror individually, in the presence of counsel. The judge's questions were properly phrased to avoid eliciting information about the deliberative process and discover any information disclosed by Juror 8 that was not presented at trial. Indeed, through a first round of questioning on May 14, the judge learned that someone had mentioned hearing that defendant's bail was set at two million dollars during deliberations. That disclosure prompted a second round of individual questioning on the next day the jury convened, May 18. During their individual interviews, six jurors recalled hearing about the bail and four said Juror 8 was the person who mentioned it. All of the jurors maintained that they remained able to decide the case fairly and impartially on the evidence adduced at trial. Juror 8 denied hearing about or mentioning the bail.

The judge stated her findings and conclusions on the errant juror's disclosures on May 18. Crediting Juror 8's account of the context in which he discussed the candy with the other jurors, she found that none of his disclosures were malicious or driven by personal agenda, and she determined that Juror 8 understood that he could not make any further disclosures and must decide the case based solely on the evidence.

Findings based upon a judge's assessment of a juror's testimony and feel of the case generally are entitled to deference. *State v. R.D.*, 169 *N.J.* 551, 560, 781 *A.*2d 37 (2001). In this case, however, it was error to rely upon Juror 8's profession of his ability to decide the case solely on the evidence adduced at trial and the judge's instructions on the law, which is what a juror must do. *Id.* at 557–59, 781 *A.*2d 37. Juror 8 had demonstrated his inability or unwillingness to do either. In disregard of personal direction from the judge and the jury instructions at the close of case, during deliberations Juror 8 had disclosed his relationship with Peralta and what he heard about the candy, thereby supplementing the evidence introduced at trial and contradicting defense counsel's closing argument. Moreover, Juror 8 had failed to disclose Mimi's link with Peralta's sisters and Dotson's children during jury selection. Had he done so, his dismissal for cause before the jury was sworn would have been required.

A trial judge "should see to it that the jury is as nearly impartial as the lot of humanity will admit." *State v. Deatore*, 70 *N.J.* 100, 106, 358 *A.*2d 163 (1976) (citations and internal quotation marks omitted). Performance of that obligation requires distinguishing "potential jurors who are able to put their opinions or prior knowledge aside from those who are unable to," in order to select a jury consisting of twelve jurors who are each able to decide the case based on the evidence and the law. *State v. Williams*, 113 *N.J.* 393, 429, 550 *A.*2d 1172 (1988).

Juror 8's mid-deliberation disclosures made it apparent that he was not qualified to sit. He could not segregate what he had heard about the crime prior to trial from the evidence presented

at trial and could not follow the judge's direction for him to refrain from disclosing his relationship with Peralta or the general instructions directing all jurors to consider nothing but the evidence.

In this circumstance, reliance on Juror 8's representation was an abuse of discretion. Indeed, reliance on Juror 8's representation would have been ill-advised even if he disclosed nothing other than the relationship between Mimi and the aunts of Dotson's surviving children who cared for them. Disclaimers of partiality by one who has a relationship with the victim or the victim's family members are inadequate because they are contrary to human nature. *See State v. Fortin,* 178 *N.J.* 540, 629, 843 *A.*2d 974 (2004) (noting, on that reasoning, that it is "ill-advised, as a general rule, to seat any juror who is acquainted with a murder victim's loved ones"); *Deatore, supra,* 70 *N.J.* at 106, 358 *A.*2d 163 (on the same reasoning, suggesting that judges excuse, with consent of the attorneys, a prospective juror acquainted with a victim *or* a witness without questioning about partiality).

For all of the foregoing reasons, we conclude that the judge erred in allowing Juror 8 to continue participation after learning about his misconduct.

█ With respect to the impact of Juror 8's disclosures on the other jurors, the judge found that their concern about Juror 8 being on the panel and knowing Peralta was eliminated when they were informed that he had told the judge and the lawyers about their acquaintance before the jury was impaneled. The judge also determined that the information about defendant's bail had no capacity to prejudice the jury because she had instructed them to disregard any evidence concerning defendant's ability to make bail.

 Our disagreement is not with findings, the problem is that it was error to rely on the jurors' professions of ability to serve no matter how sincere. "When a jury is exposed to extraneous information after deliberations have begun, a mistrial will almost always be required." *State v. Hightower,* 146 *N.J.* 239,

264, 680 *A.*2d 649 (1996); *see, e.g., State v. Kociolek,* 20 *N.J.* 92, 96–97, 118 *A.*2d 812 (1955) (reversing a conviction returned by jurors who learned about the defendant's prior indictment for assault and battery despite the fact that the trial court directed them to render a verdict based only upon the trial evidence). Moreover, where the jury is exposed to information not in evidence, the first question is whether the information "could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge." *Panko v. Flintkote Co.,* 7 *N.J.* 55, 61, 80 *A.*2d 302 (1951). If the information has that tendency, a mistrial is required regardless of the jurors' opinions on their ability to proceed. *Hightower, supra,* 146 *N.J.* at 266–67, 680 *A.*2d 649. In that circumstance, " '[t]he test is not whether the irregular matter actually influenced the result....' " *R.D., supra,* 169 *N.J.* at 558, 781 *A.*2d 37 (quoting *Panko, supra,* 7 *N.J.* at 61, 80 *A.*2d 302).

Juror 8's disclosures had the capacity to influence. When the jury presented the note, defense counsel argued that Juror 8's account of how the candy came to be on Dotson's body was problematic because it contradicted his closing argument with information not in evidence. The judge discounted that argument, noting there was ample evidence establishing that one of Dotson's children found her body.

In our view, the potential impact of a juror disclosing information about the candy, while the jurors were discussing that candy during deliberations, cannot be overstated.[4] The disclosure did even more than provide a new explanation for the candy being on Dotson's body and thereby undermine defense counsel's closing. It conveyed a picture of a three-year-old child putting candy on her mother's body and thinking enough about her gesture to tell her aunt about it—a truly disturbing image. The tendency of

---

[4] As previously noted, the judge credited Juror 8's account of the context in which he told the others what he heard about the candy, and he did that while the jurors were discussing the candy.

Juror 8's misconduct to preclude the other jurors from considering nothing but the evidence and the law in deciding whether the State proved defendant's guilt was too apparent to permit them to decide that issue. " 'In any sound judicial system it is essential not only that justice be done but also that it *appear* to be done.' " *Fortin, supra,* 178 *N.J.* at 630, 843 *A.*2d 974 (quoting *State v. Jackson,* 43 *N.J.* 148, 160–61, 203 *A.*2d 1 (1964), *cert. denied,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965)).

[At the court's direction, its recitation and discussion of Section III has been omitted from the published opinion.]

Reversed and remanded for further proceedings.