**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2082-16T2

JESSE DIAZ,

      Plaintiff-Respondent,

v.

CITY OF TRENTON, LEONARD
CARMICHAEL, JR., and JAMES
HALL,

      Defendants-Appellants,

and

QAREEB A. BASHIR, Director of
Fire & Emergency Services,

      Defendant.

_____

         Argued January 30, 2019 – Decided March 7, 2019

         Before Judges Alvarez, Nugent, and Reisner.

         On appeal from Superior Court of New Jersey, Law
         Division, Mercer County, Docket No. L-1058-14.

Michael E. Sullivan argued the cause for appellants (Parker McCay, PA, attorneys; Michael E. Sullivan, of counsel and on the briefs).

George T. Dougherty argued the cause for respondent (Katz & Dougherty, LLC, attorneys; George T. Dougherty, on the brief).

PER CURIAM

Defendants City of Trenton (City), Deputy Fire Chief Leonard Carmichael, and Fire Captain James Hall (collectively, defendants) appeal from a December 16, 2016 order denying their motion for a mistrial, a December 16, 2016 order denying their motion to set aside an award for future emotional distress damages and for remittitur of punitive damages, and a January 10, 2017 order entering final judgment on a jury verdict.

Plaintiff Jesse Diaz, a Trenton firefighter, filed a Law Against Discrimination (LAD) complaint against defendants and Fire Director Qareeb A. Bashir, alleging that he was retaliated against and constructively discharged from his employment with the City Fire Department for reporting the use of a racial epithet by another firefighter. See N.J.S.A. 10:5-12(d) (prohibiting reprisals for opposing discrimination). After a lengthy trial, a jury no-caused plaintiff's constructive discharge claim and his retaliation claim against Bashir. However, the jury returned a verdict against the City, Carmichael, and Hall for

2                                                                    A-2082-16T2

retaliation. The jury awarded plaintiff $300,000 for past emotional distress and $200,000 for future emotional distress. In a subsequent proceeding, the jury awarded plaintiff $250,000 in punitive damages against the City.

On this appeal, defendants contend that the trial court: should have ordered a mistrial based on juror misconduct; should have set aside the award for future emotional distress; erred during the punitive damages phase of the trial, by allowing plaintiff to rely on the conduct of Bashir and persons not named as defendants; and should have remitted the award of punitive damages. After reviewing the voluminous record, including the entire trial transcript, in light of the applicable legal standards, we affirm.

I

Based on our review of the record, there was ample evidence on which the jury could conclude that plaintiff was subjected to unlawful retaliation in violation of the LAD. Indeed, defendants do not claim that the liability verdict was against the weight of the evidence. For purposes of this appeal, the following summary of the evidence will suffice.

Plaintiff, who is Hispanic, served as a Trenton firefighter for twelve years before the events that gave rise to this lawsuit. He was well-regarded by his colleagues including his supervisors, and he enjoyed their camaraderie and

3

support. That changed after plaintiff overheard a white firefighter named Plumeri use a racist term in referring to an African-American colleague. Although the colleague was not present, plaintiff believed that the incident was serious, and that Plumeri should be disciplined for using racist language in the firehouse. Plaintiff believed that Hall, their immediate supervisor, was not taking the incident seriously, and he insisted on bringing the matter to the attention of Fire Director Bashir, who was African-American. Bashir overrode the recommendations of Hall and several other members of management, who wanted to let Plumeri off with a written warning, and instead imposed a suspension.

Thereafter, Hall started harassing and retaliating against plaintiff, and plaintiff's colleagues isolated him. Eventually, plaintiff asked for a transfer to a different firehouse. When he arrived, his new supervisor told plaintiff that he had received numerous phone calls warning him that plaintiff was disloyal and a troublemaker. Among other things, the supervisor told plaintiff that Carmichael warned him to watch out for plaintiff.[1] False rumors, incited by

---

[1] In a later incident, Carmichael held up his middle finger in plaintiff's presence twice in one night. At trial, he admitted doing this but claimed that "giving the finger" was his version of camaraderie and was only directed at someone standing near plaintiff.

A-2082-16T2

Carmichael, began to circulate that plaintiff carried a gun in the firehouse, and that he was dangerous. Plaintiff felt like an outcast and feared that his colleagues would not back him up while he was fighting fires.

While serving as a soldier in Iraq, years before he became a firefighter, plaintiff had developed post-traumatic stress disorder (PTSD). His PTSD did not prevent him from having a successful career as a firefighter. But due to the reprisals and harassment, plaintiff suffered an exacerbation of his PTSD, and he went out on sick leave. While plaintiff was out on leave, Bashir ordered that the combinations on all the firehouse doors be changed. According to a trial witness, this change was aimed at plaintiff and was known in the fire department as the "Diaz policy." Due to his PTSD, plaintiff was unable to return to work and retired on a disability pension.

II

In their first point, defendants contend that the trial judge erred in denying their mistrial motion, based on an incident that occurred during jury deliberations. We review the trial judge's decision for abuse of discretion. State v. R.D, 169 N.J. 551, 559 (2001). On this record, we find no abuse of discretion.

During deliberations, the jury foreperson (juror 1) reported to the judge that there was conflict between jurors 6 and 7, and that juror 7 was threatening

to walk out and refuse to continue deliberating. The judge questioned jurors 6 and 7 separately, in the presence of counsel. He learned that juror 7 believed that juror 6 was behaving in an overbearing manner and was not fairly considering the evidence, and juror 6 believed that juror 7 was pro-defense and was trying to cause a mistrial because his view was in the minority. However, both jurors 6 and 7 stated that they could decide the case fairly and continue to deliberate. The judge questioned the rest of the jurors, all of whom responded that they were aware of some tension between jurors 6 and 7, but they did not feel intimidated or affected by it and could continue to deliberate fairly.

The next day, juror 7 reported to the judge that juror 6 had brought extrinsic materials into the jury room and was trying to convince the other jurors that his opinions were entitled to special weight because he was a corrections officer. The judge interviewed juror 6, who freely admitted bringing certain items into the jury room to try to convince his fellow jurors that his views deserved greater "credibility" and they should accept his analysis of the trial evidence.

Juror 6 showed the court and counsel the materials he had brought into the jury room, consisting of his corrections officer badge, his gun permit, a commendation and certificate he had received from the Corrections Department,

A-2082-16T2

and a report he had either written or received during the course of his employment. Juror 6 stated that he had not actually let his fellow jurors read the report, but had only shown them that the report was signed in two places and date stamped. His stated purpose was to convince them that he had special expertise in report writing. None of the documents were, or purported to be, evidence relating to this case. Rather, they purportedly related to juror 6's life experience, from which he hoped to convince his fellow jurors that they should respect his point of view.

The judge immediately instructed the entire jury that juror 6 had acted improperly in bringing extraneous materials into the jury room and that they were to decide the case based only on the evidence introduced at the trial. The judge then individually questioned each juror. During that questioning, only jurors 6 and 7 told the judge that they felt unable to continue deliberating. The remaining jurors told the judge that they would give no consideration to the materials juror 6 had brought into the jury room and nothing that had transpired with juror 6 or juror 7 would influence their decision of the case. As the judge would later explain in denying defendants' post-trial motion, he found the remaining jurors entirely credible based on observing their demeanor, including their unhesitating answers to his questions.

A-2082-16T2

With the agreement of both counsel, the judge excused jurors 6 and 7. He then instructed the remaining jurors to begin their deliberations anew, from the beginning, giving no consideration to any comments they had heard from jurors 6 or 7. The jury returned a verdict later that day.

When jurors are exposed to extraneous evidence that poses a genuine risk of unfairly influencing the verdict, a mistrial is ordinarily required, even if the jurors all state that they will disregard the evidence. See R.D., 169 N.J. at 557-58; State v. Negrete, 432 N.J. Super. 23, 34 (App. Div. 2013). For example, where the jury obtained evidence from the defense counsel's file that had not been admitted at trial, after the documents were mistakenly left in the jury room, a mistrial was required. Brown v. Kennedy Mem'l Hosp., 312 N.J. Super. 579, 589-91 (App. Div. 1998). Likewise, a mistrial was required when a civil jury learned, during deliberations, that the defendant had enough liability insurance to cover a large verdict. Panko v. Flintkote Co., 7 N.J. 55, 60-61 (1951). On the other hand, not every piece of extrinsic information will necessitate a mistrial. The trial judge must consider the "gravity" of the information and whether, based on the judge's feel for the case, the information could have a genuine tendency to influence the verdict. R.D., 169 N.J. at 559-60.

In this case, the briefs focus on the sample report juror 6 brought into the jury room. The court did not keep copies of juror 6's materials as court exhibits, and the description of the sample report is minimal. However, it is clear that the other jurors never saw the body of the report, only some signatures and a date, and the report did not concern this case or even the fire department. Based on the record we have, we conclude that juror 6's collection of extrinsic materials, including the report, had no genuine potential to influence the verdict. None of the materials had anything to do with this case, and he did not claim that they did. Rather, they were aimed at bolstering his status with his fellow jurors.

Even if juror 6 claimed that the Department of Corrections report[2] he brought with him was an example of the "right" format for an official report, that information would be irrelevant. All of the reports in evidence in this case, including plaintiff's report to Bashir describing the racist statement, were in the same format. They were not typed on a standard report form. Rather, they were signed, dated letters to a superior officer in the fire department. With respect to Carmichael's May 4, 2012 report about plaintiff allegedly bringing a gun to his meeting with Carmichael, the issue was not whether the report was in proper

_____

[2] We infer that the report was a State of New Jersey Department of Corrections report, because juror 6 was a corrections officer. However, we would reach the same result if it was a report to a municipal agency.

form, but whether the meeting Carmichael described actually took place. Plaintiff claimed there was no such meeting and the report was false.

In short, juror 6's somewhat bizarre conduct was not of the type that would have a genuine potential to affect the verdict, and other than juror 7, whose response to juror 6 seemed rather exaggerated, the remaining jurors appeared entirely unaffected by it. Nor did they seem affected by the conflict between jurors 6 and 7. We conclude that the trial judge dealt appropriately with jurors 6 and 7, conducted a thorough and appropriate voir dire of the remaining jurors, and did not abuse his discretion in denying a mistrial.

### III

We agree with plaintiff that defendants' challenge to the damage award for future emotional distress is barred, because defendants did not file a timely motion for a new trial on that issue. See R. 4:49-1(b); R. 2:10-1; Fiore v. Riverview Med. Ctr., 311 N.J. Super. 361, 362-63 (App. Div. 1998).[3] However, even if we were to consider the issue, defendants' arguments are without merit.

---

[3] Defendants try to sidestep the untimeliness of their motion, by arguing that the trial judge should have sua sponte declined to charge the jury as to future emotional distress damages. However, that argument is based on a purported lack of evidence. Pursuant to Rule 1:3-4(c), the time to file a new trial motion cannot be enlarged, and we reject defendants' effort to avoid that stricture.

A-2082-16T2

A LAD claim for future emotional distress damages requires expert testimony. See Cuevas v. Wentworth Grp., 226 N.J. 480, 512 (2016); Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 551-54 (2013). However, in this case, plaintiff presented expert testimony, as did defendants. All of the mental health experts who testified agreed that plaintiff suffered from an underlying condition of PTSD, originally caused by his experiences as a soldier in Iraq. There was no dispute that his PTSD did not prevent plaintiff from successfully serving as a firefighter for twelve years. Plaintiff presented psychiatric evidence that due to the incidents following his complaint about Plumeri's racist statement, plaintiff suffered an exacerbation of the PTSD, causing the condition to become symptomatic.

Plaintiff's treating psychiatrist described in great detail the terrible mental suffering caused by active PTSD. A psychologist who performed an independent medical examination on behalf of the Division of Pensions testified that he had no hesitation in declaring plaintiff totally and permanently disabled by the PTSD, and that plaintiff would not in the foreseeable future be able to perform any job in the fire department. Even the defense psychiatrist agreed that plaintiff's PTSD rendered him permanently unable to perform his job. Reasonable jurors could infer from the testimony that plaintiff's symptomatic

11

PTSD was a permanent condition and would continue to cause him mental suffering into the foreseeable future.

IV

We find no merit in either of defendants' arguments concerning the punitive damage award. Except as discussed herein, those arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

We agree with the trial judge that the jury's decision clearing Bashir of aiding and abetting retaliation did not preclude plaintiff from arguing that Bashir's conduct was relevant to the punitive damage claim. Even if Bashir did not aid and abet in the reprisals, the jury was entitled to consider whether Bashir was willfully indifferent to reprisals that other members of upper management were directing at plaintiff. Further, the judge's charge to the jury on punitive damages made clear to the jury that in deciding whether upper management engaged in or was willfully indifferent to the retaliation, they could only consider the actions of Bashir, Carmichael and Hall. A fleeting reference by plaintiff's counsel to two other battalion chiefs would not have confused the jury on that point.

Given the egregious nature of the reprisals, we find no miscarriage of justice in the punitive damage award, nor can we conclude that the award was disproportionate to the injury inflicted on plaintiff.  See Lockley v. State of New Jersey Dep't of Corrs., 177 N.J.  413, 433 (2003).  We find no basis to second-guess the trial judge's decision to deny defendants' remittitur motion.  See Cuevas, 226 N.J. at 501.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2082-16T2