**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."  Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2408-19

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

MARQUISE BROWN,

 Defendant-Appellant.

_____

   Submitted January 24, 2022 – Decided March 15, 2022

   Before Judges Fasciale and Sumners.

   On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 18-11-1008.

   Hegge & Confusione, LLC, attorneys for appellant (Michael Confusione, of counsel and on the briefs).

   Esther Suarez, Hudson County Prosecutor, attorney for respondent (Erin M. Campbell, Assistant Prosecutor, on the brief).

   Appellant filed a pro se supplemental brief.

PER CURIAM

As a result of the walk-up shooting death of Amir Pleasant, a jury found defendant Marquise Brown guilty of first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2), second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1), second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1), and first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:11-3(a)(1).[1]  Defendant was tried with his co-defendants, Rashad Exum and Jahi Beatty, who were both found not guilty of murder and the weapon charges.  However, Exum was found guilty of conspiracy to commit murder, and Beatty was found guilty of hindering apprehension or prosecution of another, N.J.S.A. 2C:29-3(a)(3), and hindering his own apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1).  (Ibid.).  A fourth person who was with defendants during the shooting, William Davis, entered into a cooperation agreement with the State resulting in his guilty plea to lesser charges and trial testimony against defendants.

After merger, defendant was sentenced to life in prison for murder with an eighty-five percent period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2.  Because of a prior conviction for possession of a

---

[1]  The trial judge dismissed the charge of second-degree possession of a weapon by a person not permitted to do so, N.J.S.A. 2C:39-7(b)(1).

firearm, defendant was required to serve at least thirty-five years under the Graves Act, N.J.S.A. 2C:43-6(c); N.J.S.A. 2C:43-7(a)(6).

On appeal, defendant through counsel challenges his conviction and his sentence, arguing:

> POINT I
>
> DEFENDANT'S RIGHT TO A FAIR TRIAL WAS VIOLATED BECAUSE THE JURY SAW HIM COMING OUT OF THE COURTROOM IN HANDCUFFS AND THE TRIAL COURT FAILED TO PROPERLY VOIR DIRE THE JURY PANEL AND ENSURE THERE WAS NO UNFAIR PREJUDICE TO DEFENDANT.
>
> POINT II
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A MISTRIAL BECAUSE OF THE CONTINUOUS USE OF A NICKNAME BEFORE THE JURY.
>
> POINT III
>
> THE EDITED VERSION OF CO-DEFENDANT JAHI BEATTY'S STATEMENT TO POLICE PLAYED FOR THE JURY BELOW CAUSED AN UNFAIR TRIAL FOR DEFENDANT. (NOT RAISED BELOW).
>
> POINT IV
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR ACQUITTAL.

A-2408-19

POINT V

DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

In a pro se supplemental brief, defendant argues:

POINT I

THE TRIAL COURT VIOLATED DEFENDANT MARQUISE BROWN['S] SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESS AGAINST HIM AND DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONST. AMEND. 6 AND 14.

    A.  PLAIN ERROR

    B.  HEARSAY AND CONFRONTATIONAL RULE

POINT II

APPELLANT[']S DUE PROCESS AND RIGHT TO FAIR TRIAL W[ERE] VIOLATED BECAUSE [A] JUROR HAD BEEN EXPOSED TO UNFAIR OUTSIDE PREJUDICE AND THE TRIAL COURT FAILED TO PROPERLY VOI[R] DIRE THE JURY PANEL TO ENSURE THERE WAS NO UNFAIR PREJUDICE TO DEFENDANT.

We conclude that none of defendant's arguments have merit and affirm.

I.

On April 29, 2017, at approximately 4:53 a.m., Jersey City police received a call of gunshots fired around 15 Dwight Street. When the police arrived at the

4

location they saw no victim, but they did see numerous shell casings and shattered glass in the street. Moments later, the police received a report of nearby motor vehicle accident. Upon arriving at the accident scene at 5:10 a.m., they learned that a man with two gunshots to his head was in a car with front-end damage stopped in the middle of the intersection of Jersey Avenue and Grand Street near the Jersey City Medical Center. The victim, identified as Pleasant, was taken to the hospital by emergency medical transport, where he was pronounced dead.

The ensuing investigation obtained a surveillance video depicting a man, at 4:47 a.m. on April 29, approach Pleasant's car on Dwight Street and fire four gunshots into Pleasant's car. After being shot, Pleasant drove away and crashed his car. Additional surveillance video showed a silver two-door Honda Civic stopping in the area of the shooting on two separate occasions: roughly thirty minutes before the shooting and around the time of the shooting. The police were able to identify the car and its owner, Chayana Clark, Davis's live-in girlfriend at the time and the mother of his child.

Learning that police had "grabbed" Clark and were looking for him, Davis voluntarily went to the Hudson County Prosecutor's Office on May 3, where he told investigators that defendant shot and killed Pleasant. After giving his

A-2408-19

statement, Davis was arrested and charged with "murder, conspiracy, [and] unlawful possession of a weapon." Defendant was arrested the next day. According to Davis, he did not make any type of deal with the State in exchange for giving his statement.

Nine months later, on February 8, 2018, Davis gave a second statement to investigators. He identified himself, defendant, Exum, and Beatty in surveillance video still photos taken from a convenience store they went to right after Pleasant's murder.

On July 11, 2018, Davis pled guilty to second-degree aggravated assault and conspiracy in connection with "a cooperation agreement[,]" in which he agreed to "testify and tell the truth" about Pleasant's killing.

Defendant's trial was conducted over fourteen days in September 2019. Davis was the State's primary witness. His testimony essentially mirrored his statements to investigators.

Davis testified that he was driving Clark's car with defendants Beatty and Exum as passengers when they saw Pleasant, an "op[p]"—meaning "[e]nemy [o]pposition"—of theirs, at a gas station. Defendant, known as "Shoddy" to Davis, was not initially with them; through happenstance they saw defendant on the street and stopped to talk to him. Exum asked defendant if he had a gun

because they had just "seen our op[p]s." Defendant responded that he would "go get it," then got in the back seat of the car and directed Davis to drive to a nearby building. When they arrived at their destination, defendant got out of the car, entered the building, and came back within five minutes. He returned to the back seat of the car, behind the front passenger's seat. Davis did not see a gun.

Davis then drove back to where they had seen Pleasant. Once they were in the vicinity, Davis heard a gun being "cocked . . . back." Exum told defendant "[t]hat's him right there." After Davis stopped the car, defendant exited and, within moments, Davis heard approximately four gunshots. Exum climbed into the back seat. After defendant returned to the car and sat in the front passenger seat, Davis drove away. Davis testified that defendant then stated "[h]e shot him two times in the head. And he shot two more times."

## II.

We first address defendant's arguments involving jurors. In Point I, he argues through counsel that the trial court "failed to ensure [his] fundamental right [to a fair trial] was secured . . . by failing to sufficiently inquire of juror [number ten] or of any of the other jurors on the panel" regarding their observation of defendant in handcuffs during the trial. In Point II of his

supplemental pro se brief, defendant argues that after the court dismissed juror number eleven for being exposed to unfair outside influence, it failed to voir dire the other jurors to ensure defendant was not prejudiced. Because neither contention was raised before the trial court, defendant must show the court's alleged shortcomings were plain error "clearly capable of producing an unjust result." R. 2:10-2.

## A.

Under the Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution "the right of a defendant to be tried by an impartial jury is of exceptional significance." State v. Williams, 93 N.J. 39, 60 (1983). The very essence of a fair trial is the securing and preservation of an impartial jury. See Sheppard v. Maxwell, 384 U.S. 333, 362-63 (1966). "[A] defendant is entitled to a jury that is free of outside influences and will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself." Williams, 93 N.J. at 60.

If the trial judge is aware that outside influences may have influenced jurors, "the . . . judge must take action to assure that the jurors have not become prejudiced as a result of facts which 'could have a tendency to influence the jury

A-2408-19

in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge.'" State v. Bisaccia, 319 N.J. Super. 1, 12 (App. Div. 1999) (quoting State v. Scherzer, 301 N.J. Super. 363, 486 (App. Div. 1997)). The test is not whether the irregularity actually influenced the jurors but "whether it had the capacity of doing so." Panko v. Flintkote Co., 7 N.J. 55, 61 (1951). "[W]here . . . there is the possibility of actual juror taint or exposure to extraneous influences . . . , the judge must voir dire that juror and, in appropriate circumstances, the remaining jurors." Bisaccia, 319 N.J. Super. at 13 (citation omitted). We summarized the trial judge's obligation stating:

> The thrust of the New Jersey and federal cases on mid-trial allegations of jury misconduct is that the trial judge must make a probing inquiry into the possible prejudice caused by any jury irregularity, relying on his or her own objective evaluation of the potential for prejudice rather than on the jurors' subjective evaluation of their own impartiality. Although the trial judge has discretion in the way to investigate allegations of jury misconduct, an adequate inquiry on the record is necessary for the purposes of appellate review.
>
> [Scherzer, 301 N.J. Super. at 487-88 (citation omitted).]

"A new trial, however, is not necessary in every instance where it appears an individual juror has been exposed to outside influence." State v. R.D., 169 N.J. 551, 559 (2001). The trial judge must "consider the gravity of the

extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings." Ibid. Additionally, "when that extraneous information is knowledge unique to one juror who is excused mid-trial," the court must examine "whether there was at least an opportunity for the extraneous information to reach the remaining jurors." Ibid.

In particular, the judge should ask the juror about

> the specific nature of the extraneous information, and whether the juror intentionally or inadvertently has imparted any of that information to other jurors. Depending on the juror's answers to searching questions by the court, the court must then determine whether it is necessary to voir dire individually other jurors to ensure the impartiality of the jury. . . . Although the court should not simply accept the juror's word that no extraneous information was imparted to the others, the court's own thorough inquiry of the juror should answer the question whether additional voir dire is necessary to assure that impermissible tainting of the other jurors did not occur.

> [Id. at 560-61.]

An appellate court reviews a trial court's determinations as to whether a jury has been tainted and whether to expand an inquiry to other jurors under an

abuse of discretion standard. Id. at 559-61. The trial court should explain its determination "on the record to facilitate appellate review." Id. at 560.

B.

Defendant's first challenge arises from the concern that juror number ten may have seen defendant in handcuffs. The judge and counsel believed that when the juror returned to the courtroom after initially going downstairs with the other jurors for their lunch break, the juror had the opportunity to see defendant being escorted to lock up. Defense counsel recommended that the judge ask juror number ten, "is there anything you need to tell us about, you know, when you came . . . back up on the floor"? Counsel did not want the questioning to "come across as . . . accusatory [b]ecause . . . if he didn't see anything, . . . [it would be] blowing this out of proportion."

Before the trial reconvened, the judge questioned juror number ten outside of the presence of the other jurors. The juror confirmed that after the jury was released for lunch, he went downstairs and came back up on the elevator because he believed he forgot his car keys. He stated he "never even got off the elevator" because he "realized that [his] keys were in [his] bag." When asked, he denied seeing anything unusual from inside the elevator. Defense counsel declined the judge's invitation to ask the juror any questions. Before allowing juror number

11

ten to return to the jury panel, the judge instructed him not to discuss anything they talked about.

The record demonstrates that the judge properly questioned juror number ten out of concern that the juror may have seen defendant in handcuffs. There is little question that jurors should not see the defendant on trial before them in handcuffs or similar restraints because of the potential it would prejudice their view of his or her innocence. See State v. Damon, 286 N.J. Super. 492, 498 ("A defendant's freedom from handcuffs or shackles is important to his right to a fair and impartial trial.") (citation omitted). Yet, absent a showing of prejudice, the fact that one or more jurors saw a defendant handcuffed outside the courtroom does not deprive him or her of a fair trial. State v. Sykes, 93 N.J. Super. 90, 91-94 (App. Div. 1966).

In this trial, there was no evidence juror number ten saw defendant in handcuffs. Heeding defense counsel's concern not to accuse juror number ten of any wrong, the judge carefully questioned the juror and found him creditable in responding that he did not see anything upon returning upstairs to the courtroom when the handcuffed defendant was being escorted out of the courtroom. Neither the defense nor the State asked the judge to question the jury panel if anyone saw defendant in handcuffs. The judge did not abuse her

discretion in allowing juror number ten to remain on the jury and not to voir dire the other jurors. Defendant has not shown any actual prejudice occurred, thus there was no plain error.

C.

Two days after the concerns about juror number ten, the judge voir dired juror number eleven after he asked to speak to her in private concerning his uncertainty about his ability to serve as a juror given "the severity of the case." The request came during a second recess after earlier testimony that morning.

In the presence of counsel and defendant but not the jury panel, juror number eleven disclosed that he inadvertently learned Pleasant was a patient in a mental health and addiction clinic where his live-in girlfriend worked. The juror avowed that he did not discuss the matter with any other jurors. Both defense counsel and the prosecutor stated the juror should be dismissed. The judge agreed. Before dismissing the juror, the judge directed him not to speak to any jurors about his knowledge of Pleasant. At no point did the defense or the State request that the other jurors be questioned on whether juror number eleven disclosed any information to them about Pleasant. Defense counsel asked the judge to instruct the jury that juror number eleven was excused for reasons

A-2408-19

"personal to that juror" and that the jury was "not to consider that." The court instructed the jury to that effect.

Defendant now argues that after the judge dismissed juror number eleven, he erred by "fail[ing] to make any inquiry as to whether the other sitting jurors had [] been exposed to this extraneous information." This argument is unpersuasive as no manifest injustice occurred in not questioning the other jurors about juror number eleven's knowledge that his girlfriend knew Pleasant from her employment.

Juror number eleven informed the judge that he did not discuss the matter with any other jurors. While "[t]he response of a juror is not necessarily sufficient," R.D., 169 N.J. at 563, the circumstances here lend additional credibility to the juror's insistence that he did not speak to the other jurors. In addition to "the trial court's apparent assessment of his credibility," ibid., the fact that none of the attorneys for the three defendants nor the prosecutor requested a voir dire of the other jurors suggests they also believed juror number eleven's claim that he did not speak to other jurors about Pleasant. Furthermore, the juror's "promptness in coming forward," ibid., and his request to speak with the trial judge "in private" (10T87;10T91), demonstrates an actual effort to keep the extraneous information from his fellow jurors. Finally, the court's

14

"repeated[] instruct[ion] [to] the jurors not to discuss the case with each other until they were so directed," id. at 562, including immediately before both recesses on the day of the voir dire, sufficiently protected defendant's right to a fair trial. (10T62;10T86). "We presume the jury followed the [judge's] instructions." State v. Smith, 212 N.J. 365, 409 (2012).

Moreover, the extraneous information that Pleasant, the murder victim, was a patient at a mental health and addiction clinic had no capacity to "induce bias or prejudice," or otherwise influence the jury in arriving at its verdict in a manner inconsistent with the evidence. The information did not involve racial bias, State v. Tyler, 176 N.J. 171, 182 (2003), extraneous knowledge about the crime, State v. Wormley, 305 N.J. Super. 57, 68-70 (App. Div. 1997), extraneous assertions of a defendant's guilt, State v. Grant, 254 N.J. Super. 571, 584-86 (App. Div. 1992), or extraneous information about a defendant's prior crimes, State v. Fortin, 178 N.J. 540, 576 (2004). In sum, defendant points to no bias or prejudice that occurred because the judge did not voir dire the jury panel after juror number eleven's disclosure about Pleasant.

III.

In Point II, defendant argues the trial judge erred in denying his motion for a mistrial based on Davis's continuous use of defendant's nickname,

"Shoddy," during his testimony. He argues the ruling "allowed defendant to be improperly prejudiced by the continual and excessive use of the Shoddy nickname before the jury at trial, warranting a new trial."

"Whether an event at trial justifies a mistrial is a decision 'entrusted to the sound discretion of the trial court.'" State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). We will not disturb the denial of a mistrial "unless there is a clear showing of mistaken use of discretion by the trial court," Greenberg v. Stanley, 30 N.J. 485, 503 (1959) (citations omitted), or a manifest injustice would result, State v. LaBrutto, 114 N.J. 187, 207 (1989). We discern no abuse of discretion.

Before trial, defendant's counsel persuaded the judge that because there could be "some prejudicial value in the mind[s] of the jurors hearing" the nickname, its use would be limited to just an initial identification of defendant. The judge advised that, upon request, she would give a limiting instruction if she determined that defendant might be prejudiced by the repeated use of his nickname.

On direct examination, Davis initially identified defendant by his nickname. Although the prosecutor thereafter referred to defendant as "Mr. Brown" during direct examination, Davis only briefly referred to defendant by

his legal name and otherwise continued to use the name "Shoddy" in his testimony. He also referred to co-defendants Beatty and Exum by their nicknames, "Ja Ja" and "Ra Ra." After defense counsel objected and sidebar was held, the prosecutor increased his use of leading questions referring to defendant as "Mr. Brown." At the end of Davis's testimony for the day, the court instructed Davis not to use defendant's nickname.

The next day, defendant unsuccessfully moved for a mistrial due to Davis's use of defendant's nickname. The judge ruled that the references to the nickname were not "so prejudicial . . . to warrant a mistrial." However, the judge allowed that if the use of defendant's nickname continued, the motion could be renewed. From that point on, Davis mostly referred to defendant by his legal name, but stated the nickname twice.

In his closing statement, the prosecutor referred to defendant's nickname once when paraphrasing a statement allegedly made by Exum. After summations and outside the presence of the jury, defendant's trial attorney objected. He acknowledged that the prosecutor's use of the nickname "was an oversight clearly" and after that "brief moment" the prosecutor "went right back to Mr. Brown or Marquise Brown." Defense counsel requested that "no . . . further reference be given to" the nickname and specifically requested that a

"curative instruction" not be given as it would draw more attention to the nickname. Defendant did not renew his motion for a mistrial.

In criminal trials, references to defendants as well as witnesses by nicknames is not uncommon. Hence, "use of defendant's street nickname during trial cannot serve as a per se predicate for reversal." State v. Paduani, 307 N.J. Super. 134, 146 (App. Div. 1998) (identifying the defendant to police by his nickname, "Marijuana"). Referring to a defendant's pejorative nickname is appropriate where it is relevant to identifying a defendant but "should be kept from the jury [if not] relevant for some purpose." Id. at 147 (quoting State v. Salaam, 225 N.J. Super. 66, 72 (App. Div. 1988). "[T]o constitute grounds for reversal, 'some tangible form of prejudice' to the defendant must be demonstrated." State v. Parker, 216 N.J. 408, 420 (2014) (quoting Salaam, 225 N.J. Super. at 73). Prejudice occurs where a nickname or alias has "been intentionally offered as indicia of guilt," Paduani, 307 N.J. Super. at 147 (quoting Salaam, 225 N.J. Super. at 73), or to "impeach the credibility of a witness," Parker, 216 N.J. at 421. On the other hand, where "the references to the defendants' false name[] were brief and the State did not use the false name[] to make a substantive point or impeach the credibility of a witness" does not serve as a basis to reverse a conviction. Id. at 421.

There is no dispute that initial use of defendant's nickname was properly admitted for identification. Despite attempts to limit its use, Davis's use of it more times than necessary did not constitute a reason for reversal of his convictions because no prejudice occurred. The State did not make any connection between the nickname and the allegations. It did not refer to "Shoddy" as a "street name" or imply that it related to criminal activity suggesting his guilt. Also, the State did not use the nickname to attack the credibility of any witness

In sum, nowhere during the trial did Davis's testimony or the prosecutor's remarks stated or suggested the nickname had a negative association. Moreover, by declining that a curative instruction regarding the nickname be given, defense counsel avoided the possibility such an instruction suggesting defendant's nickname carried a negative connotation.

## IV.

In Point III, as well as Point I of his pro se supplemental brief, defendant argues for the first time on appeal that he was deprived of a fair trial when the jury was allowed to view the nontestifying Beatty's videorecorded police statement, in which the State redacted the comment that defendant was "never there [in the car]." The jury was permitted to see and hear Beatty's claim that

19

he did not know who was in the passenger's seat, and when he stated he did not know if it was defendant, the police investigator replied "Yeah." The jury also viewed Beatty's statement that he was asleep for much of his time in the car and only Exum and Davis were in the car.

Defendant contends the "redacted statement [was] prejudicial [because] it (1) distorts the meaning of the statement, or (2) excludes information substantially exculpatory of the nontestifying defendant." United States v. Smith, 794 F.2d 1333, 1335 (8th Cir. 1986). Defendant asserts Beatty's omitted statement was necessary to provide "completeness," "context," and "avoid misleading the trier of fact" in order to ensure "a fair and impartial understanding" of the admitted statement. State v. DeRoxtro, 327 N.J. Super. 212, 223 (App. Div. 2000) (quoting State v. Gomez, 246 N.J. Super. 209, 220)). Defendant's arguments are without merit.

While it may have been preferable for the jury to hear the redacted portion of Beatty's statement, the jury was permitted to hear Beatty's exculpatory remarks. The jury heard Beatty state three times that he did not know who was in the car other then he, Exum, and Davis because he was asleep "the whole entire time." There was, however, Davis's testimony that defendant joined Davis, Exum, and Beatty in the car; he left the car to retrieve a gun; they drove

until Pleasant was spotted again; he got out of the car; gunshots were heard; and he returned to the car declaring he shot Pleasant four times. Furthermore, Davis testified that following the shooting they went to a convenience store, which he confirmed in a still photo from the store's surveillance video camera system that was admitted into evidence depicting him and defendants.

Defendant's reliance on Smith and other cases is misplaced. Smith held that a nontestifying defendant's "right to have the entire statement introduced," also known as "the rule of completeness," is "violated . . . when the statement in its edited form, while protecting the sixth amendment rights of the co-defendant, effectively 'distorts the meaning of the statement or excludes information substantially exculpatory' of the nontestifying defendant." 794 F.2d at 1335 (quoting United States v. Kaminski, 692 F.2d 505, 522 (1982)). In such a case, "severance is . . . required." Kaminski, 692 F.2d at 522.

Cases cited by defendant specifically concerned whether severance was required where portions of a statement by a nontestifying defendant that were omitted because they were inculpatory to a co-defendant were substantially exculpatory of the declarant. Smith, 794 F.2d at 1335; Kaminski, 692 F.2d at 522. In this case, the declarant was Beatty, not defendant, and the statements were neither inculpatory of defendant nor exculpatory of Beatty.

21

Nevertheless, Beatty's omitted statement did not exculpate defendant. He insisted he did not know if defendant got in the car because he was sleeping. Accordingly, omission of the statement was not clearly capable of producing an unjust result and does not constitute plain error. See State v. Downey, 237 N.J. Super. 4, 14 (App. Div. 1989) (holding that any error in the admission of testimony was harmless because it was "merely cumulative of the inferences to be drawn from other evidence").

V.

In Point IV, defendant argues that the trial court erred in denying his Rule 3:18-1 motion for acquittal. Defendant argues that "[t]he purchased testimony of . . . Davis was not nearly enough to sustain the State's case by the reasonable doubt standard." We are unpersuaded because Davis's testimony, if found credible by the jury, was undeniable evidence of defendant's guilt.

"In assessing the sufficiency of the evidence on an acquittal motion, we apply a de novo standard of review." State v. Williams, 218 N.J. 576, 593-94 (2014). When a defendant moves for acquittal following the conclusion of the State's case, the trial judge must determine whether "based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could

find guilt beyond a reasonable doubt." Id at 594. "[C]redibility issues . . . [should] not be resolved by the judge when ruling on the motion" to acquit. State v. Pickett, 241 N.J. Super. 259, 265 (App. Div. 1990). "These issues [are] properly submitted to the jury." Ibid.

Davis, admittedly an accomplice to Pleasant's murder, provided the only evidence implicating defendant as Pleasant's killer as a result of his cooperation agreement with State. "[O]ne witness' testimony" without corroborating evidence is sufficient to sustain a conviction in most cases, State v. Williams, 122 N.J. Super. 377, 379 (App. Div. 1993) (citation omitted), including "solely on the uncorroborated testimony of an accomplice," State v. Adams, 194 N.J. 186, 207 (2008) (internal quotation omitted); see also State v. Roundtree, 106 N.J. Super. 135, 151 (Law Div. 1969), aff'd, 118 N.J. Super. 22 (App. Div. 1971) ("jurors are permitted to find facts based upon the testimony of a single witness whom they find to be worthy of belief.").

It is permissible trial strategy for a defendant "to expose the bias of [a] [w]itness" who testifies against him or her on the expectation of "favorable treatment promised . . . for his [or her] cooperation in [the] case . . . for the purpose of undermining his credibility before the jury." State v. Hernandez, 225 N.J. 451, 464-465 (2016). A defendant may do so both through cross-

examination on the witness's "expectation of favorable treatment" and by arguing to the jury that the witness "has sold his services and testimony to the State." Id. at 465. It was therefore up to the jury, not the judge, to determine if Davis's testimony was believable. See State v. Pickett, 241 N.J. Super. 259, 265 (App. Div. 1990). Hence, the judge correctly denied defendant's motion to acquit.

VI.

In Point V, defendant argues through counsel that his life sentence was excessive, the trial court inadequately explained its sentencing decision, and a remand is warranted so that the judge can consider mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14), even though it took effect after he was sentenced. We are unpersuaded.

Defendant, twenty-three years old at the time of the murder, had five prior indictable convictions as an adult, including "two convictions for possession of a firearm . . . for an unlawful purpose," for which he was sentenced to five years in state prison with three years parole ineligibility. At his December 9, 2019 sentencing, the judge applied aggravating factors three, risk of committing another offense; six, the extent and seriousness of prior criminal record; and nine, the need for deterrence. N.J.S.A. 2C:44-1(a)(3), -1(a)(6), and -1(a)(9).

She determined no mitigating factors applied. Based upon the credible evidence in the record, the judge's weighing of the sentencing factors that were in effect at the time was not an abuse of discretion and defendant's sentence does not shock the judicial conscience. State v. Bolvito, 217 N.J. 221, 228 (2014) (citations omitted).

Effective October 19, 2020, approximately ten months after defendant was sentenced, a new statutory mitigating factor fourteen took effect providing consideration of that "[t]he defendant was under 26 years of age at the time of the commission of the offense." N.J.S.A. 2C:44-1(b)(14). We are mindful that our Supreme Court granted certification in State of New Jersey v. Rahee Lane, No. A-92-20 (App. Div. March 23, 2021), cert. granted, 248 N.J. 534 (2021), in which the legal issue is whether N.J.S.A. 2C:44-1(b)(14) applies retroactively, and if so, to what extent. Unless and until the Court holds to the contrary in Lane, we abide by our holding in State v. Bellamy, 468 N.J. Super. 29, 48 (App. Div. 2021), that mitigating factor fourteen does not apply retroactively absent resentencing "for a reason unrelated to the adoption of [N.J.S.A. 2C:44-1(b)(14)]."[2] Nothing in this opinion precludes the court on remand from

_____

[2] The Court's recent decision in State v. Rivera, 249 N.J. 285 (2021), is distinguishable. In Rivera, the Court had an independent basis to remand for

amplifying its sentencing decision by considering whether the sentence would be different accounting for the new mitigating factor. Cf. State v. Canfield, No. A-5586-18 (App. Div. 2022) (slip op. at 126).

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

resentencing: the improper treatment of the defendant's youth as an aggravating factor. Id. at 303. Accordingly, the trial court was permitted to apply mitigating factor fourteen. Id. at 303-304. Here, there is no independent basis to remand for resentencing.