**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0539-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANGEL NUNEZ-HERNANDEZ,

    Defendant-Appellant.

_____

Submitted March 8, 2022 – Decided March 24, 2022

Before Judges Fisher, Currier, and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-07-0516.

Joseph E. Krakora, Public Defender, attorney for appellant (David J. Reich, Designated Counsel, on the brief).

William A. Daniel, Union County Prosecutor, attorney for respondent (Milton S. Leibowitz, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Angel Nunez-Hernandez, and two others,[1] were charged with first-degree robbery, N.J.S.A. 2C:15-1, second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2, and other offenses arising from a holdup of a gas station in Rahway at approximately 1:00 a.m., on April 10, 2016. After the denial of defendants' motions to suppress physical evidence and statements made to police, the three were tried together. Defendant Nunez-Hernandez was acquitted of first-degree robbery but convicted of the lesser-included offense of third-degree theft, N.J.S.A. 2C:20-2(b)(2), and convicted of second-degree conspiracy to commit robbery, fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d), and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). After the denial of defendant's motion for a new trial – based on the argument that the judge should have but failed to charge the jury on the offense of conspiracy to commit theft – and after merging the theft conviction into the conspiracy conviction – defendant was sentenced to a nine-year prison term, with an eighty-five percent period of parole ineligibility. Lesser concurrent terms were imposed on the weapons convictions.

_____

[1] The appeals of the other two defendants – Jose Mena (A-3508-18) and Mario Cabrera-Pena (A-3678-18) – are disposed of by way of separate opinions also filed today.

A-0539-19

Defendant appeals, arguing[2]:

> I. THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS BECAUSE THERE WAS NO REASONABLE SUSPICION FOR THE STOP.
>
> II. THE TRIAL COURT ERRED IN CONCLUDING THAT SUPPRESSION OF THE EVIDENCE SEIZED DURING THE UNLAWFUL PROTECTIVE SWEEP WAS NOT REQUIRED BECAUSE THE DISCOVERY OF THE EVIDENCE WAS INEVITABLE.
>
> III. A NEW TRIAL IS REQUIRED BECAUSE THERE IS A SUBSTANTIAL POSSIBILITY THAT THE COURT'S HANDLING OF THE JURY DELIBER-ATION PROCESS RESULTED IN A VERDICT BASED ON EXTRANEOUS CONSIDERATIONS IN VIOLATION OF [DEFENDANT'S] CONSTITU-TIONAL RIGHT TO A UNANIMOUS VERDICT BASED SOLELY ON THE EVIDENCE AND THE LAW.
>
> IV. A REVERSAL IS REQUIRED IN VIEW OF THE PLAIN ERROR COMMITTED BY THE COURT IN FAILING TO CHARGE THE LESSER-INCLUDED OFFENSE OF CONSPIRACY TO COMMIT THEFT.
>
> V. A REMAND FOR RESENTENCING IS NECESSARY IN VIEW OF RECENT LEGISLATION AUTHORIZING A SENTENCING JUDGE TO TREAT THE AGE OF DEFENDANT LESS THAN 26 AS A MITIGATING FACTOR.

---

[2] We have rearranged the order of defendant's arguments from how they appear in his brief.

A-0539-19

We find insufficient merit in defendant's fifth point because his argument relies only on an incorrect assumption that the new mitigating factor codified at N.J.S.A. 2C:44-1(b)(14) applies retroactively. See State v. Bellamy, 468 N.J. Super. 29, 43-48 (App. Div. 2021).

With that, we turn to defendant's other four arguments.

I

Defendant first argues that the trial judge erred in denying his motion to suppress evidence seized from a motor vehicle he occupied shortly after the hold-up of the Rahway gas station because, in defendant's view, police lacked reasonable suspicion to stop the motor vehicle.

Based on evidence presented at the suppression hearing, the judge found that Officer Donald Dayon responded to an alarm from the gas station on St. Georges Avenue. On arriving, he encountered Officer Douglas Botti, who was speaking with Ravinder Singh, a gas station attendant. Singh advised that he had just been held up at knifepoint by two men. He described one of the perpetrators as tall, "fat," and white or light-skinned, and the other as a short, thin black man. Both were wearing hooded sweatshirts, one dark and one of a lighter color. According to Singh, the two perpetrators ran off on foot in a westerly direction on Inman Avenue, which intersects with St. Georges Avenue. Officer Dayon

drove off in that direction, using his spotlight to illuminate the surroundings. He soon encountered a silver Honda parked on Inman Avenue facing east toward the gas station on St. Georges Avenue.

Officer Dayon observed three men inside the vehicle. The backseat passenger, later identified as Jose Mena, appeared to be a large male[3] wearing a black hooded sweatshirt. The driver, later established to be defendant, was a thin, light-skinned male also wearing a dark hooded sweatshirt. The front-seat passenger, later determined to be Mario Cabrera-Pena, was a dark-skinned male wearing a gray hooded sweatshirt; he was described by Officer Dayon as being thinner than the backseat passenger.

According to Officer Dayon, the three men stared at him "intently, like very nervously" as he drove past, and that each man swiveled his head to watch as he made a U-turn and pulled up behind the Honda. Dayon was interested in investigating these men further with regard to the gas station hold-up because of "the demeanor of the way they were looking at [him] and the fact that [there were] three males with . . . hoodies on, a larger male, a thinner male in the vehicle." After pulling up behind the Honda, Officer Dayon activated the

---

[3] Dayon testified the backseat passenger was "heavy set" and so large "he was taking up the [back] window."

A-0539-19

overhead lights on his patrol car and radioed his location and the Honda's license plate number to other officers. He remained in his patrol car until other officers arrived. While waiting, Officer Dayon observed the three defendants in the Honda and described their movements:

> [T]hey started moving around all over the vehicle. The individual in the back seat [Mena] was reaching down. He was moving around back and forth as if he was moving stuff in the car. The individual in the front passenger seat [Cabrera-Pena] began making . . . movements as if [he was] taking [his] clothes off, like . . . lifting [his] butt up out of the seat.

When back-up arrived, Officers Dayon and Botti exited their vehicles and approached the Honda on the driver's side, while other officers approached the vehicle on the passenger's side. Officer Botti told defendants to keep their hands up, and Officer Dayon asked defendant, who was sitting in the driver's seat, for his credentials. Officer Botti asked defendant what they were doing in the area and defendant responded that he was using his GPS. At that point, Officer Dayon radioed to dispatch and stated "[w]e're going to do a show-up," meaning that they were going to have Singh look at the Honda's occupants to see if any of them were the perpetrators that had just held up the gas station.

Before the show-up could occur, Officer Dayon asked defendant to turn off the car's engine and hand him the ignition key. Defendant complied and

A-0539-19

Officer Dayon placed the key on the roof of the Honda. Officer Dayon asked defendant who the Honda belonged to, and defendant in turn asked the others; Mena said the Honda belonged to his friend "Martinez."

Defendant was removed from the Honda so the officers could "speak to him" and pat him down for weapons.[4] No weapons were found in his possession. Cabrera-Pena was then removed from the Honda and patted down for weapons. No weapons were found in his possession. Officer Dayon then looked in the Honda in the area immediately surrounding the front-passenger's seat "because when [he] pulled up [Cabrera-Pena] was moving around a ton." As he did so, Mena, who was still in the backseat, told Officer Dayon "[y]ou can't search the car." Officer Dayon explained that he could do a plain-view search, and Mena was then also removed from the Honda.

Officer Dayon saw a pair of red pants on the floor of the vehicle near the front-passenger's seat. He moved the pants aside to determine whether there was a weapon underneath. But, before touching the pants, Officer Dayon radioed other officers to determine whether any of the suspects had been wearing red

---

[4] Prior to removing defendant from the vehicle, officers received confirmation from dispatch that the Honda belonged to an individual named Fiore Martinez. The car had not been reported stolen, nor were there any reports of criminal activity linked to the vehicle.

A-0539-19

pants. When he did not receive a response, Officer Dayon moved the pants and discovered a "wad of cash" underneath the passenger's seat. After finding the cash, Officer Dayon continued looking under the passenger's seat where he eventually found a knife handle next to the cash. All three Honda occupants were then handcuffed and taken to the police station.

Defendant argues that the motor vehicle stop was unconstitutional. We disagree. Both the Federal Constitution and New Jersey Constitution protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; N.J. Const. art. I, par. 7. "It is well established that the investigative stop of an automobile by police constitutes a seizure" under the Fourth Amendment, State v. Amelio, 197 N.J. 207, 211 (2008), but the seizure is permissible if it is "reasonable and justified by articulable facts," State v. Coles, 218 N.J. 322, 343 (2014). An assessment of reasonable suspicion "must be based upon the law enforcement officer's assessment of the totality of the circumstances." State v. Davis, 104 N.J. 490, 504 (1986).

The burden is on the State to show "by a preponderance of the evidence that it possessed sufficient information to give rise to the required level of suspicion," which "requires some minimal level of objective justification for making the stop." Amelio, 197 N.J. at 211-12; see also Ornelas v. United States,

517 U.S. 690, 696 (1996) (defining reasonable suspicion as "a particularized and objective basis for suspecting the person stopped of criminal activity") (internal quotation marks omitted); State v. Stovall, 170 N.J. 346, 356 (2002) (holding that an officer may conduct an investigatory stop if "based on the totality of the circumstances, the officer had a reasonable and particularized suspicion to believe that an individual has just engaged in, or was about to engage in, criminal activity").

A valid investigatory stop cannot be based solely on an officer's subjective, good faith belief even if that belief turns out to be correct. State v. Arthur, 149 N.J. 1, 8 (1997). "The principal components of a determination of reasonable suspicion" are the events that "occurred leading up to the stop . . . , and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." Stovall, 170 N.J. at 357.

"In evaluating the sufficiency of the basis for a stop or arrest, courts consider the totality of the information available to the officer at the time of the conduct. . . . Information acquired subsequently cannot be used to either bolster or defeat the facts known at the time." State v. Pitcher, 379 N.J. Super. 308, 315-

16 (App. Div. 2005) (internal citation omitted). "It is axiomatic that hindsight may not be employed." Id. at 316.

After conducting a hearing over several days on defendants' motions to suppress, the judge held that Officer Dayon "had a reasonable and articulable suspicion to believe that defendants had been involved in the robbery of the . . . gas station" sufficient to justify the investigatory stop of the vehicle. In so holding, the judge relied primarily on the following facts: the Honda was the only car in the area and was only four or five houses down from the scene of the offense; Officer Dayon observed defendants making furtive movements inside the vehicle; defendant's lack of information about the Honda's ownership; and Officer Dayon's "conclusion that two of the [defendants] fit the description[s] given by Mr. Singh."

In arguing Officer Dayon lacked reasonable suspicion for the investigatory stop, defendant primarily relies on the difference between the description of the suspects Singh initially gave to police and defendants' actual appearances. But, even if not precisely the same as Singh described, his observations and Officer Dayon's were similar. Moreover, the stop wasn't based significantly or solely on race and sex, as was the case in State v. Nyema, 249 N.J. 509 (2022), but on other information Officer Dayon gathered as he watched

10

defendants before back-up arrived. For example, Officer Dayon was entitled to be suspicious of the Honda as it was the only vehicle in the immediate area of the hold-up, and he was entitled to be suspicious of the occupants because they intently stared at him as he passed in his patrol car. Moreover, defendants' curious movements inside the vehicle were rightfully viewed as consistent with their relationship to the hold-up.

Defendant relies on what he claims are discrepancies between what Singh described when identifying the culprits and what Officer Dayon observed when watching the Honda's occupants. The differences are negligible in light of the circumstances and the conditions in which they were seen. Singh described one as being a large, white or light-skinned male, when in fact Mena is a large light-skinned Hispanic male, and Officer Dayon saw Mena as being light-skinned and very large. Singh described the other as shorter and dark-skinned, and Officer Dayon described Cabrera-Pena as dark-skinned. Because the suspects were seated in a vehicle, any discrepancies about height would seem somewhat irrelevant in considering whether Officer Dayon was entitled to be suspicious about the Honda's occupants. In addition, like Singh's description of the two men wearing dark hooded sweatshirts, so too did Officer Dayon observe Mena and Cabrera-Pena as wearing dark hooded sweatshirts. When considering the totality

A-0539-19

of the circumstances, these discrepancies are not sufficient to defeat the claim of reasonable suspicion. Indeed, the question at this stage was not whether Singh's description was accurate as to the true appearance of the two that held him up but whether Officer Dayon was justified – based on what Singh described – in being reasonably suspicious that the two who held up Singh were seated in the Honda. We are satisfied that the judge was entitled to make that finding.

We therefore conclude that police had a reasonable and articulable suspicion to stop the Honda. We find any other unmentioned aspects of this argument to be of insufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

II

Having found a legitimate basis for the stop of the Honda, the judge went on to find that the officers engaged in an unlawful protective sweep of the vehicle because the occupants had been removed from the vehicle and were in the control of the officers. See, e.g., State v. Radel, 249 N.J. 469 (2022). Nevertheless, the judge found that the inevitable discovery doctrine would have led them to the evidence seized from the vehicle and, therefore, there was no reason to exclude that evidence.

A-0539-19

To explain, we start by observing that "[t]he exclusionary rule 'is a judicially created remedy designed to safeguard' the right of the people to be free from 'unreasonable searches and seizures.'" State v. Williams, 192 N.J. 1, 14 (2007) (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). As explained in State v. Sugar, 100 N.J. 214, 238 (1985), the inevitable discovery exception to the exclusionary rule allows the admission of illegally-obtained evidence if the State can prove that the evidence would have been discovered had the illegality not occurred by showing:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.

We find no reason to second-guess the judge's determination that the discovery of the cash and knives found in the Honda was inevitable because soon after the improper protective sweep, Singh was brought to the Honda and made a positive identification of Mena as one of the two who held up the gas station. As noted earlier, Officer Dayon was interested in having Singh brought to the Honda for a show-up sooner. And, to be sure, the inappropriate sweep

13

occurred before the show-up. But once the show-up occurred, Singh identified Mena, and the officers then had probable cause to search the vehicle. In addition, the fact that the show-up did not precede the vehicle search was of no moment; police properly towed the vehicle and later obtained the owner's consent to search it.

## III

Defendant argues the trial judge erred in his handling of circumstances that arose during jury deliberations that, in defendant's view, "resulted in a verdict based on extraneous considerations" in violation of his constitutional right to a unanimous verdict based on the evidence and the law.

Jury unanimity is required in all criminal prosecutions, R. 1:8-9, and "the right to a free and untrammeled verdict . . . is the core of the right to trial by jury," State v. Figueroa, 190 N.J. 219, 233 (2007).  As the Court stated in State v. Czachor, 82 N.J. 392, 409 (1980), "[c]ritical to achieving such an impartial verdict is the independent and honest judgment of each juror that the State has proved defendant's guilt beyond a reasonable doubt." And, of course, the verdict must be "based upon the evidence and the law, not extraneous considerations such as the efficiency and expense of jury trials."  State v. Adim, 410 N.J. Super. 410, 423 (App. Div. 2009). Nevertheless, the trial judge has the discretion to

respond to jury issues. State v. R.D., 169 N.J. 551, 559 (2001). And we will defer to the judge's sound discretion when "exercising control over matters pertaining to the jury." Id. at 559-60.

To put defendant's arguments in context, we briefly outline the various relevant occurrences during the jury's deliberations. First, we note that earlier in the proceedings, the judge provided the jury with an understanding about scheduling. Due to the length of the trial, by the time jury deliberations began, only two days were left of the days prognosticated for the completion of the trial. If the jury failed to return a verdict by the end of those two days, the jurors would have had to wait an additional twelve days before they would have the opportunity to complete their deliberations.

On the first day of deliberations, the jury informed the judge they had reached a verdict as to Mena, but not as to defendant or Cabrera-Pena, and that a juror had to leave by 4:30 p.m. The jury sent the judge a note asking: "[p]lease explain the continuing schedule. What is next?" The judge thanked the jury and told them to return for further deliberations at 1:30 p.m. the following day.

The following day, the judge and counsel discussed the advisability of a Czachor charge. All counsel agreed such a charge would be premature. At 3:27 p.m., the jury sent a note to the judge, stating they were "irreconcilably

deadlocked" on some counts while also asking to view again the gas station surveillance footage. At that point, Cabrera-Pena's counsel moved for a mistrial based on the jury's assertion of a deadlock but, because a Czachor charge had not yet been given, the judge denied the motion. When the jury reentered the courtroom, the judge had the surveillance footage replayed for them without addressing the issue of a deadlock.

After a portion of the video was played, a juror advised that they wanted to see the video from the beginning. In response, the judge asked the jury to return to the jury room and note specifically what they needed to see. The jury then informed the judge they wanted to see both surveillance videos, including from inside and outside of the gas station, in their entirety. The videos were then played, following which the judge gave the jurors a Czachor charge and instructed them to resume deliberations.

After the jury resumed their deliberations, the judge discussed with counsel the possibility of returning the following week if necessary. Cabrera-Pena's counsel had previously advised she would be unavailable the following week and, under the circumstances, felt it inadvisable to allow another attorney to fill in for her.

A-0539-19

Before anything could be resolved about scheduling, the judge received a note from Juror Number 8 that stated: "I don't believe all jurors (just one) are making their decision from an objective standpoint. Also, is it possible for me to be excused after today? Can we talk on a side bar to discuss?" Mena's counsel claimed this required the declaration of a mistrial. The judge was hesitant about bringing Juror Eight out because he did not want "a juror revealing what's going on in the jury room, and that's what's maybe going to happen." The judge instead decided to give the jury another <u>Czachor</u> charge. Mena's counsel again voiced concerns, saying "I don't know what they said but . . . if we don't address it now, and we don't talk about it and just give that charge, something might happen there that we might regret later on." The judge repeated that he was hesitant to speak with Juror Eight out of fear that it would lead to that juror revealing information that could lead to a mistrial. The judge and counsel again discussed scheduling in the event deliberations had to continue into the following week.

The judge then brought the jury back into the courtroom, again gave a <u>Czachor</u> charge, and directed the jury to continue deliberating. At 6:03 p.m., the jury sent a note stating it had reached a verdict as to all three defendants.

In claiming error arising from these circumstances, defendant first focuses on the jury's earlier claim that they were "irreconcilably deadlocked" on some

17

counts. As noted, that statement was accompanied by the jury's request to see again the surveillance video. We find no error or abuse of discretion in the judge's approach. Indeed, the note's declaration of a deadlock while also seeking a further review of evidence could have properly been viewed as inconsistent. The judge sensibly focused on the jury's request for a review of the video rather than the claim of a deadlock. The jury had not been deliberating for so long as to take the deadlock claim more seriously than an expression of the status of their deliberations. The trial consisted of almost four full days of testimony and then a day that consisted of nothing but summations and jury instructions. The jury had only been deliberating for a few hours and, in those few hours, was able to reach a verdict as to Mena. It was too soon to take seriously a claim of a deadlock, and we are satisfied the trial judge did not abuse his discretion by giving a Czachor charge and sending the jurors back for further deliberations without inquiring about the jury's ability to reach a verdict.

The second aspect of defendant's argument concerns the judge's handling of Juror Eight's note about a fellow juror's alleged lack of objectivity. Instead of addressing the juror's concerns head-on, the judge chose to again give a Czachor charge.

A-0539-19

We find no abuse of discretion in how the judge handled the situation. Defendant, in fact, concedes that "there is no per se rule barring the repeated use of a Czachor charge," and acknowledges the amount of time between the first and second Czachor charges was "extremely minimal."

Defendant, however, claims the judge erred by failing to inform the jury why he was again instructing them in the manner permitted by Czachor, and that he should have affirmatively addressed the note from Juror Eight. We disagree. The charge itself[5] is so self-explanatory that an instruction as to why it was given would be redundant.

We also agree that the judge was not required to question Juror Eight in the circumstances. Defendant relies on State v. Vergilio, 261 N.J. Super. 648, 655 (App. Div. 1993), where we held in a similar situation that "the judge at the very least should have issued a strong cautionary instruction before asking the jury whether further deliberation might produce a unanimous verdict." The

---

[5] The judge gave the charge in these words: "Ladies and gentlemen, it is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement if you can do so without offending your own individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict."

judge did much the same thing here, issuing a <u>Czachor</u> charge before sending the jury back for deliberations. We are satisfied that was sufficient.

IV

Finally, defendant argues the judge erred by failing to charge the jury on conspiracy to commit theft. Because he did not request such a charge, defendant is relegated to arguing that it was plain error for the judge not to sua sponte give such an instruction. <u>State v. Alexander</u>, 233 N.J. 132, 141-42 (2018). Plain error occurs when an action by the trial court "is of such a nature as to have been clearly capable of producing an unjust result." <u>R.</u> 2:10-2. The possibility of an unjust result "must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." <u>Alexander</u>, 233 N.J. at 142. We find no merit in this argument because the evidence would not support such a finding; the only evidence of a conspiracy concerned a conspiracy to commit robbery.

An unrequested charge must be given only when the evidence "clearly indicates" its appropriateness. <u>State v. Savage</u>, 172 N.J. 374, 397 (2002). In making this determination:

> the trial court is not required to scour the statutes to determine if there are some uncharged offenses of which the defendant may be guilty. The trial court is also not saddled with the burden of sifting meticulously

20

through the record to find some combination of facts and inferences that might rationally sustain the lesser included offense. It is only when the facts clearly indicate the appropriateness of that charge that the duty of the trial court arises. We have explained that the record clearly indicates a lesser-included charge . . . if the evidence is jumping off the page. In sum, our caselaw only requires a trial court to include a charge to a lesser offense that was not requested by the parties when that charge is obvious from the record.

[State v. Dunbrack, 245 N.J. 531, 545 (2021) (internal citations and quotation marks omitted).]

In denying defendant's new trial motion, the judge applied this standard. He noted the difference between theft and robbery, with robbery occurring when "in the course of committing a theft, [the defendant] puts the victim in fear of immediate bodily injury." The judge also observed that the evidence about the substantive offense included the fact that Mena wielded a knife. Consequently, "a lesser-included offense of conspiracy to commit theft was not 'jumping off the page.'"

Defendant argues that the same could be said for the decision to charge theft as a lesser-included offense of robbery.[6] But that question relates to the offense that was carried out and not necessarily the scope of the conspiracy.

---

[6] We assume for purposes of this decision, but do not decide, that a conspiracy to commit theft is a lesser-included offense of a conspiracy to commit robbery.

Indeed, the only evidence of an agreement between or among the defendants – besides that which related to the actual steps taken in the holdup of the gas station – came from the following statement Mena gave police:

> DETECTIVE STEFANICK: So you tell -- when you go in the store, you tell the guy, give me the money?
>
> MENA: Yeah.
>
> DETECTIVE STEFANICK: Okay.
>
> MENA: With a knife.
>
> DETECTIVE STEFANICK: Okay. And you held a knife to him?
>
> JOSE: Yeah.
>
> DETECTIVE STEFANICK: Were you going to hurt him?
>
> MENA: No.
>
> DETECTIVE STEFANICK: Just scare him --
>
> MENA: Yeah --
>
> DETECTIVE STEFANICK: -- was your plan? Yeah?
>
> MENA: -- yeah.

This statement was the only direct evidence about a plan and it reveals a plan to commit a robbery by putting the victim in fear through the wielding of a knife. The other evidence also supported only a conspiracy to commit robbery:

22

Mena used a knife during the hold-up, and the knife was obtained from defendant's home. Thus, it is entirely logical to conclude that the only evidence of a conspiracy was a conspiracy to commit a robbery. Not only may it be said, in applying the Dunbrack standard, that evidence of a conspiracy to commit theft did not jump from the page but there's simply no evidence of a conspiracy to commit just a theft. To allow the jury to consider whether there was a conspiracy to commit theft would have invited the jury to speculate about the nature of the defendants' plan.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23